**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PETER C. HAYWARD, KELLY GARCIA, and MATTHEW YBARRA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MPARTICLE, INC., and ROKT US CORP.,<br><br>Defendants. | Case No. 1:25-cv-08173-PAE<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Peter C. Hayward, Kelly Garcia, and Matthew Ybarra, individually and on behalf of all other similarly situated individuals, assert the following against Defendant mParticle, Inc. and Rokt US Corp. (collectively, "mParticle") based upon personal knowledge, information and belief (where applicable), and the investigation of counsel. The Court has jurisdiction over these claims, and venue is proper for the reasons stated in Paragraphs 60 through 63.

## SUMMARY OF ALLEGATIONS

1. Few, if any, consumers have heard the name "mParticle." But mParticle knows their names. It also knows their email, phone number, unique devices, and exactly what they are doing across the internet, so long as mParticle's inconspicuous tracking technology is running in the background. mParticle stores all this information in a consolidated and enriched user profile.

2. mParticle obtains consumers' identifying information through its product "IDSync" which it launched in 2017. Through this identity "solution"—and complimentary products (e.g., its SDK and other tracking technology)—mParticle has been secretly harvesting and monetizing directly identifiable user data from millions of U.S. residents without their knowledge.

3. IDSync operates by assigning an mParticle ID to individual users of all websites and apps that incorporate mParticle's software. The mParticle ID serves as the anchor for the entirety of the user's mParticle profile. mParticle ID boasts its technology is on hundreds of thousands of websites.

4. Whenever an individual visits a website or app that uses mParticle, its IDSync software attempts to identify the user in as many ways as it can, for instance, by intercepting full name, email, phone number, and any other identifiers mParticle can get its hands on. Each time mParticle intercepts a piece of identifying information, it adds it to the user's existing identity profile and associates it with that user's mParticle ID. Through this data collection process, mParticle has created an entire directory full of personally identifiable information on millions of U.S. residents.

5. Through the mParticle SDK and other tracking technology, mParticle also intercepts users' searches, queries, and other activity on websites and apps. In many instances, mParticle's tracking technology can be found on websites and apps that involve inherently private information, including websites used to make financial transactions or apps used to privately watch videos. This data is stored alongside the identifying information mParticle collects about each user in the same user profile.

6. Because mParticle does not rely exclusively on cookies, it circumvents traditional privacy-preserving mechanisms. For instance, traditional third-party cookies can be blocked, expire after a limited period of time, and can be reset. Users can also avoid cookies by using privacy-preserving browsers, like Mozilla Firefox. mParticle bypasses cookie blockers, privacy-preserving browsers, and incognito mode—leaving consumers at the mercy of mParticle's collection of their data.

7. Worse, one of mParticle's primary selling points to customers is its integrations with dozens of the largest advertising companies in the world. mParticle forwards its detailed customer profiles to these ad networks in real time so that individual users can be targeted with ads based on the information mParticle records in their profiles.

8. mParticle charges customers for every part of this process, from data collection and processing to storage and integrations through what it calls "value-based pricing."[1] Its customer profiling is so popular that mParticle was recently acquired for over $300 million.

9. Plaintiffs and Class Members had no knowledge that mParticle was using unique identifiers to track them across the web, mobile applications, and other internet-connected devices, or that it was using this data to create comprehensive user profiles and facilitate highly specific targeted advertising.

10. mParticle offers no consumer-facing policies or disclosure at the time it intercepts Plaintiffs' and Class Members' data, nor does it prompt users viewing the websites or other web properties of its presence.

11. mParticle's interception of the contents of Plaintiffs' and Class Members' communications with third parties through its tracking technology violates Cal. Penal Code § 631 and § 632, and its installation of a tracking device on each of the websites used across the internet violates Cal. Penal Code § 638.51(a), as well as other laws.

## PARTIES

### A. Plaintiffs

12. Plaintiff **Peter Hayward** is a resident of Los Angeles County, California.

13. Plaintiff Hayward used several online services, including Venmo, JetBlue, and

[1] *Pricing: One Platform, One Rate, Zero Restrictions*, MPARTICLE, https://www.mparticle.com/pricing/ (last visited Apr. 22, 2025).

Peacock, that implemented mParticle's IDSync and other tracking technology.

14. Unbeknownst to Plaintiff Hayward, mParticle assigned Plaintiff Hayward mParticle IDs ("mpid").

15. When Plaintiff Hayward logged in to these services, mParticle searched for and collected his directly identifiable information.

16. For instance, when Plaintiff Hayward used the **Peacock** app, mParticle intercepted his email address. It also collected the mParticle ID, and Plaintiff Hayward's advertising IDs (such as "IDFA," "IDFV," and/or "AAID"), which are persistent device identifiers.

17. mParticle processed and enriched all the data it intercepted from Plaintiff Hayward's communications with Peacock and stored this information in a consolidated user profile.

18. When Plaintiff Hayward logged on to Venmo website,[2] mParticle also intercepted directly identifiable information, including his email address, Venmo name (typically, first-last), and phone number. It also collected the mParticle ID, mParticle device ID, and a unique customer ID set by Venmo.

19. When Plaintiff Hayward made transactions on the **Venmo** website, mParticle intercepted the details of these transactions. Specifically, mParticle intercepted: (1) that Plaintiff Hayward was making a payment; (2) the recipient name; (3) recipient username; (4) that the profile type was "personal"; (5) the exact amount of the transaction; and (6) the "note" that accompanies the payment describing what the payment is for. This information is sent even if the user marked their profile as private, *i.e.*, chose that their transactions should not be seen by anyone else other than the recipient.

[2] The Venmo app similarly incorporated mParticle's IDSync and other tracking technologies.

20. mParticle processed and enriched all the data it intercepted from Plaintiff Hayward's communications with Venmo and stored this information in a consolidated user profile.

21. The information described above is transmitted regardless of whether Plaintiff Hayward declined cookies and regardless of whether he used private browsing mode or selected "Do Not Track" on his mobile device.[3] In short, Plaintiff Hayward had no way to "block" mParticle's hidden tracking tools from surreptitiously collecting his data, including his personally identifiable information.

22. Plaintiff Hayward did not consent to mParticle intercepting his personally identifiable information, assigning and using unique identifiers to track him across internet-enabled services and devices, or intercepting and using the contents of his private communications for mParticle's and others' profit.

23. Plaintiff **Kelly Garcia** is a resident of American Canyon, California.

24. Plaintiff Garcia used several online services, including Venmo, that implemented mParticle's IDSync and other tracking technology.

25. Unbeknownst to Plaintiff Garcia, mParticle assigned Plaintiff Garcia mParticle IDs ("mpid").

26. When Plaintiff Garcia logged in to online services embedded with mParticle's software, mParticle searched for and collected her directly identifiable information.

27. When Plaintiff Garcia used the Venmo app, her communications and information were also sent to mParticle, including her unique identifiers, mParticle ID, and transaction information.

28. mParticle processed and enriched all the data it intercepted from Plaintiff Garcia's

[3] Using "Do Not Track" would only prevent the interception of IDFA, not the directly identifiable information mParticle collects about the user.

communications with Venmo and stored this information in a consolidated user profile.

29. The information described above is transmitted regardless of whether Plaintiff Garcia declined cookies and regardless of whether she used private browsing mode or selected "Do Not Track" on her mobile device.[2] In short, Plaintiff Garcia had no way to "block" mParticle's hidden tracking tools from surreptitiously collecting her data, including her personally identifiable information.

30. Plaintiff Garcia did not consent to mParticle intercepting her personally identifiable information, assigning and using unique identifiers to track her across internet-enabled services and devices, or intercepting and using the contents of her private communications for mParticle's and others' profit.

31. Plaintiff **Matthew Ybarra** is resident of Santa Clara County, California.

32. Plaintiff Ybarra used several online services, including Venmo, and the NBC App that implemented mParticle's IDSync and other tracking technology.

33. Unbeknownst to Plaintiff Ybarra, mParticle assigned Plaintiff Ybarra an mParticle ID.

34. When Plaintiff Ybarra logged in to these services, mParticle searched for and collected his directly identifiable information.

35. For instance, when Plaintiff Ybarra used the **NBC App**, mParticle intercepted his name and email address. It also collected the mParticle ID, an app user ID, and Plaintiff Ybarra's advertising IDs (such as "IDFV" and/or "AAID"), which is a persistent device identifier.

36. mParticle also intercepted, at least, Video Title IDs and Video IDs while Plaintiff Ybarra used the NBC App, which reveals the precise video content viewed by Plaintiff Ybarra.

37. mParticle processed and enriched all the data it intercepted from Plaintiff Ybarra's

communications with NBC and stored this information in a consolidated user profile.

38. When Plaintiff Ybarra logged on to Venmo website, mParticle also intercepted directly identifiable information, including his email address, Venmo name (typically, first-last), and phone number. It also collected the mParticle ID, mParticle device ID, and a unique customer ID set by Venmo.

39. When Plaintiff Ybarra made transactions on the Venmo website, mParticle intercepted the details of these transactions. Specifically, mParticle intercepted: (1) that Plaintiff Ybarra was making a payment; (2) the recipient name; (3) recipient username; (4) that the profile type was "personal"; (5) the exact amount of the transaction; and (6) the "note" that accompanies the payment describing what the payment is for. This information is sent even if the user marked their profile as private, *i.e.*, chose that their transactions should not be seen by anyone else other than the recipient.

40. mParticle processed and enriched all the data it intercepted from Plaintiff Ybarra's communications with Venmo and stored this information in a consolidated user profile.

41. The information described above is transmitted regardless of whether Plaintiff Ybarra declined cookies and regardless of whether he used private browsing mode or selected "Do Not Track" on his mobile device. In short, Plaintiff Ybarra had no way to "block" mParticle's hidden tracking tools from surreptitiously collecting his data, including his personally identifiable information.

42. Plaintiff Ybarra did not consent to mParticle intercepting his personally identifiable information, assigning and using unique identifiers to track him across internet-enabled services and devices, or intercepting and using the contents of his private communications for mParticle's and others' profit.

**B. Defendant**

43. **mParticle, Inc.**[4] is a Delaware corporation with its principal place of business located in New York, New York.

44. mParticle knowingly and intentionally developed IDSync to track Plaintiffs and Class Members across internet-connected services and build comprehensive user-specific profiles.

45. mParticle knew that its IDSync software, including mParticle ID, circumvented existing privacy protections (such as "Do Not Track" and widespread adoption of third-party cookie blocking by major browsers like Safari and Firefox) because it developed this identifier specifically as an alternative to such privacy-preserving mechanisms.

46. mParticle offered these services to websites, mobile applications, and other customers so it would have a unique way of tracking Plaintiffs and Class Members across devices and platforms that it could monetize for profit.

47. mParticle knowingly and intentionally used its IDSync tracking tool, and related tracking technology, to develop comprehensive user profiles and charge mParticle's customers to access and integrate these profiles into their advertising.

48. mParticle knew that this data was sent to advertising companies because it itself provided documentation and easy-to-use methods to share this data with ad providers. mParticle directly sent this data to ad providers through data forwarding.

49. mParticle marketed its technology as offering "privacy-preserving" identity resolution, despite understanding it created a software to track users at the individual level in a manner tied to permanent, directly identifiable information, like email and phone number.

50. **Rokt US Corp.** is a Delaware corporation with its principal place of business

[4] "mParticle" as used in this section refers solely to mParticle, Inc.

located in New York, New York.

51. Rokt is an e-commerce marketing platform that specializes in offering targeted advertisements on online customer check-out pages. Rokt monetizes the check-out confirmation page by showing targeted advertisements from brands that the consumer is likely to engage with.

52. Rokt is used by over 30,000 ecommerce brands.

53. Rokt makes money from publishers (i.e., the websites and apps that show the advertisement) and advertisers (i.e., the companies whose advertisement is shown to the consumer). For publishers to use Rokt, they integrate its SDK or API on their existing websites.

54. Rokt relies on AI and machine learning to determine which advertisements to show individual consumers based on behavioral, demographic, and other data. Rokt uniquely identifies each individual user that will see Rokt-powered ads through both deterministic and contextual data, including names, email addresses (both raw and hashed), and other identifiers.

55. Since 2018, Rokt has acknowledged that the "cookie-based framework" relied on by advertisers is "fundamentally incapable of driving truly person-based marketing activity" for the reasons described herein.[5]

56. It actively advocated for identity graphs—like those used by mParticle—to track users without relying on cookies, including by stitching email addresses and other personally identifiable information in a unique "persistent ID profile."[6]

57. Rokt merged with mParticle in January 2025. mParticle provides the precise identity graph Rokt found imperative to power personalized advertising software and engage in user-specific ad targeting.

---

[5] Alex Edholm & Vladi Kuschnerov, *Moving from Cookies to Persistent Identity: A Meatier Solution to User Data*, ROKT (Sept. 17, 2018), https://www.rokt.com/blog/moving-cookies-persistent-identity-user-data/ (last visited Apr. 22, 2025).

[6] *Id.*

58. As put by Rokt's CEO and co-founder, Bruce Buchanan, combining the two companies will enable them "to bring [a] significant performance lift to [both] of [their] clients."[7] Rokt customers will be able to access mParticle's "real-time customer data platform"[8]—powered by IDSync—to ensure their advertisements are "truly person-based"[9] and mParticle customers will be able to immediately integrate the mParticle enhanced user profiles with Rokt advertising.

59. Rokt knew that mParticle's identity software thwarted existing privacy protections. Rokt was well aware that the decline of cookies prevented person-level ad targeting and was actively advocating for an identity graph like the one offered by mParticle. Its merger with mParticle was intentional, precisely so it could use this feature in its own business model, capitalizing on mParticle's profiles for selling targeted ads.

## JURISDICTION AND VENUE

60. Jurisdiction is proper under 28 U.S.C § 1332(d) because: (1) the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, (2) there are more than 100 putative members of the Class, and (3) a significant portion of Class Members are citizens of a state different from mParticle.

61. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy in this case exceeds $75,000 and this action is between citizens of different states. Plaintiffs are residents of California whereas Defendants are Delaware entities with their principal places of business in New York.

62. This Court has personal jurisdiction over Defendants because their principal places

---

[7] *Rokt And Mparticle Merge To Redefine Real-Time Relevance*, MPARTICLE, https://www.mparticle.com/news/rokt-and-mparticle-merge/ (last visited Apr. 22, 2025).
[8] *Id.*
[9] Alex Edholm & Vladi Kuschnerov, *Moving from Cookies to Persistent Identity: A Meatier Solution to User Data*, ROKT (Sept. 17, 2018), https://www.rokt.com/blog/moving-cookies-persistent-identity-user-data/ (last visited Apr. 22, 2025).

of business are in New York.

63. Venue is proper under 28 U.S.C. §1391(b), (c), and (d) because a substantial portion of the conduct described in this Class Action Complaint was carried out in this District.

## BACKGROUND OF USER TRACKING

64. Over a decade ago, Apple, Inc. announced that it would no longer allow app developers to intercept "UDIDs" which are unique, device-specific identifiers. These persistent identifiers were deprecated because they are seen as privacy intrusive—they cannot be reset and were used to facilitate device-specific targeted advertising.

65. Starting in 2020, Apple, Inc. and Google, LLC rocked the digital advertising world once again by announcing the eventual deprecation of mobile device advertising identifiers (IDFA and ADID) and third-party cookies in favor of more privacy-preserving mechanisms. Mobile advertising identifiers were seen as a replacement for UDIDs because they could be reset by the user, as can third-party cookies. However, this did not change the fact that they are ultimately privacy-invasive, as they allow ad targeting at the individual user level.

66. This created serious concerns within the multi-billion-dollar digital advertising industry. Digital advertisers relied on these device identifiers and cookies to uniquely identify individuals who use their products and services—and other entities' products and services—to curate and serve targeted advertisements to individuals, based on profiles of information reflecting web and app activity indexed to unique identifiers present in third-party cookies.

67. For instance, a mobile app developer would use identifiers like the IDFA and ADID created by iOS and Android phones to track user activity across their mobile application, understand what actions users took, and their preferences, interests, and other information. The company would then send that information to an advertising company, such as Google, to serve

targeted advertisements to that customer using this unique identifier.

68. While companies scrambled to find solutions to the eventual deprecation of unique device identifiers and third-party cookies, many of those options were not nearly as lucrative. For instance, many companies began tracking "sessions" (i.e., one interaction with the webpage) and then sought to use cross-device tracking alternatives to match each of these unique sessions to the same user. However, this alternative is not nearly as powerful as directly tracking an individual at the ***user***-level which allows for more precise (and thus successful) personalized ads.

**MPARTICLE'S UNIQUE IDENTIFIERS**

69. mParticle capitalized on the move away from device identifiers and third-party cookies by creating a persistent, unique, cross-platform identifier ***of its own*** designed precisely to "[u]nify real-time customer interactions" for better "personalization, more complete customer journey insights, and better machine learning."[10]

70. mParticle's identity software is called IDSync. IDSync is used to profile and identify individual users, every one of their separate devices, and their actions and behaviors. IDSync accomplishes this by collecting "[e]very piece of data" about a user, and "stor[ing]" this data "in a user profile."[11] mParticle ***itself*** describes this process as occurring "[b]ehind the scenes"[12]—*i.e.*, hidden from the user's view.

71. Whenever a user opens a website or app that uses the mParticle software, an identity request is automatically made to mParticle. To identify users, mParticle uses three steps. First, "[a]n identification request" is made through "one of the mParticle platform SDKs or the HTTP API" through which mParticle intercepts an end user's identifying information such as email,

---

[10] *Customer 360*, MPARTICLE, https://www.mparticle.com/platform/customer-360/ (last visited Apr. 11, 2025).
[11] *Identify Users*, MPARTICLE, https://docs.mparticle.com/guides/idsync/identify-users/ (last visited Apr. 22, 2025).
[12] *Store and Organize User Data*, MPARTICLE, https://docs.mparticle.com/guides/idsync/user-data/ (last visited Apr. 22, 2025)

customer IDs, or device identifiers or other information that can be used to identify and track the user. Next, "mParticle looks for a matching user profile" by "comparing the identifiers included in the request with" identifiers already in mParticle's system. Finally, mParticle returns a matching user profile to the client if it finds a match.[13]

72. mParticle performs this process at the beginning of an app or website session, at login, and at logging out. If mParticle identifies any additional identifying information about the user during the app or website session (such as the user entering an email address or phone number during the session), mParticle intercepts that identifying piece of information and adds it to that user's existing user profile.

73. If there is no match, mParticle creates a new user profile and assigns a new unique mParticle ID for the purpose of future identification. mParticle adds identifying information to the user profile as it identifies it on the website or app used by the user.

74. The mParticle ID is an important building block of mParticle's identity tracker. It is "a 64-bit signed integer that is used by mParticle to uniquely identify a user for the purposes of processing User Identities and Profile data."[14] "All users" are "assigned an [mParticle] ID for the purposes of retrieving profile data" when their data is sent to mParticle.[15] Thus, the mParticle ID serves as the anchor for the user's identity profile.

75. As Figure 1 shows, an mParticle client can simply type in the mParticle ID—or any other known identifier like email address, customer ID, or device ID—in a search box to pull all the profile data mParticle linked to that specific user.

---

[13] *Identify Users*, MPARTICLE, https://docs.mparticle.com/guides/idsync/identify-users/ (last visited Apr. 11, 2025).

[14] *What is MPID?*, MPARTICLE, https://support.mparticle.com/hc/en-us/articles/12812598876173-What-is-a-MPID (Apr. 22, 2025).

[15] *Id.*

**FIGURE 1**




76. Once any of these identifiers are entered, mParticle returns the user's specific profile, as shown in Figure 1.

77. As shown below, the user profile contains the mParticle ID, as well as any other identifying information or "known identities" mParticle has collected about the user, such as Customer ID and email address. mParticle also tracks user's IP address and the first and last time it has "[s]een" the user on websites or apps incorporating its SDK.[16]

78. The profiles mParticle maintains about each specific user also contain a "User Attributes" section.[17] This section lists all "available user attributes" which are updated from new "inbound data streams" including data sent via its SDK and other tracking technology.[18] These attributes can include the user's age, full name, gender, phone number, address, city, state, zip code, and country, which are used for deterministic identity mapping.

---

[16] *Customer Profiles Overview*, MPARTICLE, https://docs.mparticle.com/guides/customer-360/profiles/overview/ (last visited Apr. 22, 2025).

[17] *User Profiles*, MPARTICLE, https://docs.mparticle.com/guides/customer-360/profiles/user-profiles/ (last visited Apr. 22, 2025).

[18] *Id.*; *Start Capturing Data*, MPARTICLE, https://docs.mparticle.com/guides/getting-started/start-capturing-data/ (last visited Apr. 22, 2025); *Feeds*, MPARTICLE, https://docs.mparticle.com/guides/feeds/ (Apr. 22, 2025).

**FIGURE 2**




79. The profile also contains event data, which are tied to specific actions the user has taken on the website or app. mParticle also tracks in each user's profile the audiences the user is a part of and whether they are currently included in any advertising campaigns.

80. As long as the client keeps mParticle's SDK incorporated, mParticle "continues to collect data about the user's behavior" and storing in the user's profile.[19] mParticle's tracking technology automatically updates new identifying information as "User identity change" and "User attribution change."[20]

81. mParticle does not obtain user consent before it collects their identifying information or before it stiches the information together into a comprehensive user profile. Users cannot prevent mParticle's tracking technology and IDSync service from tracking them by declining cookies, using private browsing mode, or Apple's "Do Not Track" feature. In fact, most—if not all—users have no idea that mParticle is tracking, storing, compiling, and selling

[19] *Identify Users*, MPARTICLE, https://docs.mparticle.com/guides/idsync/identify-users/ (last visited Apr. 22, 2025).
[20] *Event Tracking*, MPARTICLE, https://docs.mparticle.com/developers/client-sdks/android/event-tracking/ (last visited Apr. 22, 2025).

their private data.

82. This makes mParticle's tracking software even stronger than identifiers that previously existed, at the expense of the individual's right to privacy.

**MPARTICLE'S DATA ENRICHMENT & MACHINE LEARNING**

83. Even though it is a significant and highly offensive privacy intrusion, mParticle's improper conduct does not end at unique, individual-level tracking across all of a user's internet-connected devices.

84. Instead, mParticle also uses the data it receives to power its machine learning models. These models "analyze thousands of behavioral signals" to figure out which "users are statistically most likely to convert" based on their client's conversion goals.[21] A "conversion" is advertising-speak for a customer buying a product or paying money for the advertised service.

85. The results from these machine learning models are provided to mParticle's clients as "Predictive Attributes" that are stored in the user profile.[22] These predictive attributes are updated "automatically based on real-time customer behavior."[23] The model "continuously recalculates" the attributes based on the user's activity.[24]

86. For example, one of mParticle predictive attributes is "how likely [a user is] to take a specific action" that matter to its client's business. mParticle can "predict[]" and "anticipate"[25] the user's likelihood to take this action because of its machine learning processes, run on thousands of data fields, and its existing information about the user.

87. mParticle's machine learning—and detailed user profiles—are also used to create

---

[21] *What About Predictive Attributes*, MPARTICLE, https://docs.mparticle.com/guides/customer-360/predictive-attributes/overview/ (last visited Apr. 22, 2025).
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Predictive Audiences Overview*, MPARTICLE, https://docs.mparticle.com/guides/segmentation/predictive-audiences/overview/ (last visited Apr. 22, 2025).

"predictive audiences"—groups of users whose mParticle's machine learning capabilities predict are all likely to take the same or similar action.[26]

88. Separately, one of mParticle's primary selling points is that it also "[e]nrich[es]" raw user data, making it more specific and actionable.[27] As explained by mParticle, it receives data in "batches" through its SDK, API, or other means. During data processing, mParticle compares the data batch to the "matching user profile and adds additional information" about the user before it is sent along to third parties through integrations (described below).[28]

**FIGURE 3**




89. As shown in Figure 3, mParticle adds data fields to the data "batch." In this example, even though the data batch previously only contained Bob's favorite food (pizza), mParticle was able to add from Bob's user profile the fact that Bob's favorite drink is beer. mParticle also appended Bob's email to the data batch, which it pulled from the mParticle User

---

[26] *Predictive Audiences Overview*, MPARTICLE, https://docs.mparticle.com/guides/segmentation/predictive-audiences/overview/ (last visited Apr. 22, 2025).
[27] *Customer Profiles Overview*, MPARTICLE, https://docs.mparticle.com/guides/customer-360/profiles/overview/ (last visited Apr. 22, 2025).
[28] *Id.*

Profile.

90. mParticle advertises that this "enrichment" process is particularly useful to "ensure[]" that "downstream tools" (i.e., advertising companies) "receive complete and accurate information about [the] users."[29] These downstream tools and integrations are described further in the next section.

91. Thus, what mParticle is really "enriching" is itself, by cashing in on its hidden and unauthorized collection of millions of internet and app users' private data.

**MPARTICLE'S INTEGRATION WITH ADVERTISING PLATFORMS**

92. The mParticle ID, and accompanying user profiles, are especially problematic because they can be and are in fact shared with advertising companies and other identity providers—such as Google, Meta, and Adobe—to enable consistent personalization and targeting across platforms.

93. When an "integration" is enabled, mParticle "forwards" its user profiles and the accompanying data directly to these advertisers and identity providers. This data can be forwarded server-side (where it cannot be observed by even data scientists) or through the user's browser.[30]

94. For example, as shown in Figure 4, one integration mParticle offers is with Facebook. mParticle forwards a user's emails, Facebook IDs, IDFA, Google Advertising IDs, and phone numbers directly to Facebook, as well as user "attributes" and event data, as described in the previous section, so that the user can be directly targeted with ads.[31]

---

[29] *Id.*
[30] *Audience*, MPARTICLE, https://docs.mparticle.com/integrations/facebook/event/ (last visited Apr. 22, 2025).
[31] *Id.*

**FIGURE 4**[32]




[32] *Audience*, MPARTICLE, https://docs.mparticle.com/integrations/facebook/audience/ (last visited Apr. 22, 2025).

95. mParticle recommends its clients enable forwarding email address and Facebook ID "whenever they are available," because they "result in higher match rates with Facebook users."[33] When data forwarding is enabled on the browser side, mParticle simultaneously transmits the data to these companies in real time, often within seconds.

96. Once integrated with Facebook, mParticle customers can use these down-stream versions of the data to create "value-based lookalike audiences" in Facebook to target users who share similar characteristics and behaviors with the customer's existing "high-value customers."[34] Customers can also combine mParticle's user profiles with Facebook's advanced matching features, thus enabling the user to be targeted at an even more specific level than they were originally. This only enhances the privacy violations to Plaintiffs and the Class, as Meta publicly states that it uses "off-Facebook" data—like the data mParticle forwards—to train its machine learning advertising models and ad targeting capabilities.

97. Similarly, mParticle allows integration with Google Ads. mParticle can forward its user profile data to Google Ads, thus enabling Google to identify individuals based on email, phone numbers, or device IDs. It can also send physical address information to Google Ads for "advanced matching."[35] Like with Facebook, mParticle also transmits event data, including "custom events," to Google.[36] Once Google Ads receives the identity profiles and event data, it would allow Google's advertising client to create "Customer Match list" for hyper-specific targeted advertising.[37] Google too uses the data in its possession for its own benefit, including improving its ad targeting capabilities.

---

[33] *Id.*
[34] Karola Karlson, *NEW! Facebook Value-based Lookalike Audiences – The Complete Guide*, ADESPRESSO BY HOOTSUITE (June 26, 2017) https://adespresso.com/blog/facebook-value-based-lookalike-audiences/.
[35] *Audience*, MPARTICLE, https://docs.mparticle.com/integrations/google-ads/audience/ (last visited Apr. 22, 2025).
[36] *Id.*
[37] *Id.*

98. mParticle has an extensive library of integrations like these, each of which enables large scale sharing and use of Plaintiffs' and Class Members' private and identifiable data. In addition to Facebook and Google, mParticle also integrates with other marketing and advertising networks, data brokers, and demand-side platforms ("DSPs") that facilitate real-time bidding for targeted advertising. This includes companies like The Trade Desk, Adobe, LiveRamp, Xandr, Snapchat, Pinterest, Yahoo, and more. In this way, mParticle acts as a conduit for distributing user data across the advertising ecosystem, continually violating individuals' privacy by disclosing information recorded in detailed profiles to advertisers who in turn can use that data for their own targeted advertising purposes.

99. In addition to data forwarding, mParticle also enables cookie syncing through its partner integrations. During this process, mParticle and participating entities (for example, Google or The Trade Desk) exchange the identifiers they use to recognize a user, often in real time as that user interacts with a website. mParticle maps those third-party identifiers to the corresponding mParticle ID and profile, enriching its own identity graph, while also enabling mParticle's partners to recognize the same individual through these shared identifiers.

100. By sharing this data with multiple downstream platforms—most of whom are major advertising platforms with extensive profiling operations—mParticle exacerbates the privacy violations to individuals like Plaintiffs and Class Members who were never informed that it obtained and disseminated their data in the first place.

## MPARTICLE USES CNAMES TO DEFEAT PRIVACY-PRESERVING MECHANISMS

101. As described herein, one of the most offending aspects of mParticle's profiling is that it defeats established privacy expectations and device and browser-level protections designed to limit third party tracking.

102. One of the ways mParticle ensures that it can collect identifiers and cookies that correspond to individual users—regardless of their privacy settings—is through Canonical Name ("CNAME") cloaking. This takes advantage of features in the Domain Name System ("DNS") that associate URLs with IP addresses of physical servers. CNAME records are intended to allow first party website operators to distinguish between services offered by their domain by providing separate names appended to the front of a URL. For example, a file upload system offered by the New York Times might be identified by the CNAME ftp, i.e., ftp.nytimes.com, to distinguish it from the main website www.nytimes.com.

103. This has important implications for tracking prevention. Modern browsers have adopted anti-tracking protections that block connection from "third party" domains and cookies—i.e., those associated with a URL other than the one an individual visited. By blocking these third party connections, browsers seek to limit users' interaction (and potential data collection) to the websites they intended to visit, protecting against tracking by entities like mParticle that they had no interaction with.

104. mParticle knows of and seeks to defeat these protections by instructing its customers to configure the CNAME (e.g., "mp.[domain].com" and "mparticle.[domain].com") to route data to its servers "to prevent blocking and ensure maximum data collection."[38]

105. Once enabled, mParticle's CNAME makes it appear as though its servers are really a part of the first party domain, so that transmissions to mParticle are not blocked by ad blockers or browsers like Safari and Firefox that otherwise prevent third party tracking.

106. This process—which must be facilitated through mParticle—further undermines Plaintiffs' and Class Members' ability to understand and control the dissemination of their own

---

[38] *Preventing Blocked HTTP Traffic with CNAME*, MPARTICLE, https://docs.mparticle.com/developers/client-sdks/ios/prevent-blocked-http-traffic/? (last visited Oct. 29, 2025).

personal data.

**PLAINTIFFS AND CLASS MEMBERS**
**HAVE A REASONABLE EXPECTATION OF PRIVACY**

107. Internet users do not expect to be tracked across every single one of their internet-connected devices, including their web browser, apps, TVs, and more, without any disclosure of what is taking place or ability to prevent it.

108. Indeed, the advent of privacy-preserving mechanisms like Apple's "Do Not Track" feature, which prevents companies from collecting IDFA/ADID from individuals who opt-out, have confirmed this expectation.

109. One study by Flurry Analytics in 2021 shows that 88% of iOS users worldwide have availed themselves of this feature, indicating an intent to prevent apps from tracking them on their mobile devices.

110. Users do not know—and did not expect—that mParticle would circumvent these protections by creating a new identifier and user profiles that are even ***better*** than IDFA/ADID at uniquely identifying them at the individual level.

111. mParticle itself does not provide any disclosures at the point of interception for Plaintiffs and Class Members to understand which websites or online services use their mParticle ID. As a result, Plaintiffs and Class Members have no way of uncovering which services do or do not contain mParticle's tracking technology.

112. As described above, there also is no way for Plaintiffs or Class Members to opt out of mParticle's tracking at the time of the interception or to avoid mParticle capturing, storing, and tracking their use of apps and websites, or its sharing of that data with undisclosed third parties.

113. Plaintiffs and Class Members reasonably expected that their online activity would not be tracked by an unknown company, let alone that their data—including personally identifiable

information such as email addresses and phone numbers—would be used to target them across online services for profit.

114. mParticle did not have consent to perform this type of omni-present cross-device tracking using Plaintiffs' and Class Members' email addresses and phone numbers.

115. That mParticle did not have consent is clear from its own CCPA disclosures. According to mParticle, they received only ***one*** request under the CCPA's right to know laws over a ***four-year period***.

**FIGURE 5**

## CCPA Requests received by mParticle

| | To Know | To Delete | Opt Out | Average Time to Respond |
|---|---|---|---|---|
| 2020 | 1 | 0 | 0 | 7 days |
| 2021 | 0 | 0 | 0 | 0 days |
| 2022 | 0 | 0 | 0 | 0 days |
| 2023 | 0 | 0 | 0 | 0 days |

116. These statistics confirm that almost no consumers knew of mParticle and certainly did not consent to its omnipresent data collection and user profiling.

**THE DATA MPARTICLE INTERCEPTS OBJECTIVELY HAS VALUE**

117. In 2023, online advertising was estimated to be a $200 billion industry.[39] The more information advertisers know about consumers, including how to reach them directly, the more revenue they can generate.

118. That is why unique identifiers and other PII, like email addresses, are extremely

[39] W. Russell Neuman, *We Should Get Paid for Our Online Data*, TIME (Nov. 30, 2023), https://time.com/6340676/get-paid-personal-online-data-essay/ (last visited Oct. 29, 2025).

valuable. Indeed, several data brokers sell access to email addresses—including hashed email addresses—for a price.

119. For instance, datarade.ai currently advertises a Datasys dataset of 10 million hashed emails (using common techniques, including SHA) for $5,000 a month.[40] Another dataset, offered by the company Irys, is specifically advertised as "identity data" containing device IDs, hashed emails, IP address, country code, and timestamps.[41] A similar dataset, offered by Strista, likewise contains hashed email addresses and IP addresses, among other PII, and retails for $9,500 a month or $114,000 a year.[42]

120. mParticle and Rokt were both aware of the value of Plaintiffs' and Class Members' PII and other private data that mParticle intercepted and used to develop user profiles. Indeed, this is precisely why Rokt merged with mParticle for $300 million, with Rokt taking a "100% stake in the company."[43]

121. According to Rokt's CEO, the value of merging with mParticle was its live feed of user data.[44] Rokt could utilize this "real-time" feed as part of its own ad targeting business, both to "match" and identify specific users and also to present them with targeted ads.[45] By leveraging "their own unified customer profiles" for targeted advertising, Rokt could be more competitive and secure "a larger share of enterprise ecommerce budgets."[46]

---

[40] *Datasys | Email Address Data | USA Coverage | Scale large quantities*, DATARADE, https://datarade.ai/data-products/datastream-group-opt-in-intent-keyword-search-data-usa-datasys (last visited Oct. 29, 2025).
[41] *Identity Data | Asia Pacific | Hashed Emails with Device Metadata*, DATARADE, https://datarade.ai/data-products/identity-data-asia-pacific-hashed-emails-with-device-meta-irys (last visited Oct. 29, 2025).
[42] *Email Address Data | Email Database | US Consumers | 650 million Consumer Email Addresses*, DATARADE, https://datarade.ai/data-products/email-address-data-email-database-us-consumers-564-milli-stirista (last visited Oct. 29, 2025).
[43] James Hercher, *Rokt Acquires mParticle For $300 Million*, ADEXCHANGER (Jan. 16, 2025), https://www.adexchanger.com/commerce/rokt-acquires-mparticle-for-300-million/ (last visited Oct. 29, 2025).
[44] *Id.*
[45] *Id.*
[46] Jan-Erik Asplund, *Rokt at $600M/yr growing 43% YoY*, SACRA (Jan. 22, 2025), https://sacra-pdfs.s3.us-east-2.amazonaws.com/rokt-at-600m.pdf (last visited Oct. 29, 2025).

122. Rokt also admits to its customers that it uses "Derived Data" (i.e., downstream versions of data it obtains from customers) for its own benefit, including using the data in machine learning algorithms and to create lookalike segments. Rokt claims ownership over this data, despite the fact that it ultimately belongs to individuals like Plaintiffs and Class Members. These are further unjust benefits that neither Rokt nor mParticle was entitled to.

**MPARTICLE CAUSES ADDITIONAL HARM**

123. In addition to the privacy intrusions described above, and the objective value of the data mParticle intercepts, mParticle's technology accesses, uses, and takes up space on Plaintiffs' and Class Members' devices and browsers.

124. mParticle's web SDK intentionally stores data, by default, in Plaintiffs' and Class Members' local storage so that these data points "persist[] . . . between page loads."[47] This includes the following data points: sessionID, sessionAttributes, userAttributes, userIdentities, serverSettings, devToken, mpid, clientId, deviceId, cartProducts, dateLastEventSent, and cookieSyncDates.

125. mParticle's technology also affects CPU load time. One study reports that websites with tracking technology incorporated in the background of webpages take nearly twice as long to load than if such tracking technology was not present on the website.[48] Tracking technologies similar to mParticle's also result in an additional 15% power consumption for loading websites, according to a separate study.[49]

---

[47] *Persistence*, MPARTICLE, https://docs.mparticle.com/developers/client-sdks/web/persistence/? (last visited Oct. 29, 2025).

[48] Andy King, *The Tracker Tax: How Third Party Trackers Impact Website Speed in the United States*, WEBSITEOPTIMIZATION.COM (Dec. 19, 2018), https://www.websiteoptimization.com/speed/tweak/tracker-performance (last visited Oct. 29, 2025).

[49] Khan Awais, *Impact of ad blockers on computer power consumption: a comparative analysis of browser ad on and built-in browsers feature*, MEMORIAL UNIVERSITY OF NEWFOUNDLAND, https://memorial.scholaris.ca/items/3f8c4808-bf66-43b0-b659-3d7a715b1b65 (last visited Oct. 29, 2025).

126. Other studies show that when these types of tracking technologies—particularly requests to tracking domains like mParticle's—are disabled, consumers can see a 44% reduction in page load time (e.g., faster loading speeds) and a 39% reduction in device data usage.[50]

127. And it takes up bandwidth. The entity Brave estimates that the incorporation of technologies similar to mParticle's takes up, on average, an additional 899 KB per webpage in bandwidth.[51]

128. Thus, if not for mParticle's secretly embedded technology, Plaintiffs and Class Members would see bandwidth, CPU, data usage, and power consumption savings. This is particularly important, as device batteries have only a finite number of charges before they need to be replaced, and most data plans have bandwidth caps after which users will be charged or experience slower load times.

## **TOLLING & CONCEALMENT**

129. The earliest Plaintiffs and Class Members could have discovered mParticle's conduct was shortly before the filing of this Complaint. Plaintiffs became aware of mParticle's conduct through communications with counsel that are protected from disclosure.

130. Plaintiffs and Class Members, despite their due diligence, could not have discovered mParticle's conduct by virtue of how the technology works and its lack of disclosures.

131. mParticle's interception of personally identifiable information and assignment of an mParticle ID happens inconspicuously in the background. This process is undetectable to an ordinary person, highly technical, and prevented Plaintiffs and any Class Member from uncovering

---

[50] Georgios Kontaxis & Monica Chew, *Tracking Protection in Firefox For Privacy and Performance*, IEEE COMPUTER SOCIETY'S TECHNICAL COMMUNITY ON SECURITY AND PRIVACY, https://www.ieee-security.org/TC/SPW2015/W2SP/papers/W2SP_2015_submission_32.pdf (last visited Oct. 29, 2025).

[51] *Accurately Predicting Ad Blocker Savings*, BRAVE, https://brave.com/blog/accurately-predicting-ad-blocker-savings/ (last visited Oct. 29, 2025).

it.

132. mParticle had exclusive knowledge that it was tracking Plaintiffs and Class Members across the internet and compiling their directly identifiable information and other data. Similarly, mParticle had exclusive knowledge that it was using this information to propagate comprehensive user profiles to train its machine learning models and to sell to third parties.

133. mParticle's fraudulent conduct prevented Plaintiffs and Class Members from discovering its conduct. mParticle maintained a privacy policy that lacked adequate disclosures for Plaintiffs and Class Members to uncover mParticle ever intercepted, had, or used their data. mParticle publicly held out its identifiers and technology as privacy-preserving mechanisms, even though they were not.

134. mParticle was under a duty to disclose the nature and significance of its data interception and use practices—especially in light of its public statements—but did not do so. mParticle is therefore estopped from relying on any statute of limitations by virtue of the discovery rule and doctrine of fraudulent concealment.

## CLASS ACTION ALLEGATIONS

135. Plaintiffs bring this action under Fed. R. Civ. P. 23 individually and on behalf of the following Classes:

> **Identifier Class:** All natural persons in the United States who were assigned an mParticle ID or had their personally identifiable information intercepted by, or shared with, mParticle.
>
> **Communications Class**: All natural persons in the United States who had their communications with third parties intercepted by, shared with, or used by mParticle without their consent.

136. The Classes exclude: (1) any judge presiding over this action or their immediate families; (2) mParticle, its subsidiaries, affiliates, parents, successors, predecessors, and any other

entity in which mParticle has a controlling interest; (3) mParticle's current and former employees, officers, and directors; and (4) Plaintiffs' and mParticle's counsel.

137. ***Numerosity.*** While the precise size of the Classes is currently unknown to Plaintiffs, each of the Classes consists of well over a million individuals and members of each of the Classes can be identified through mParticle's records.

138. ***Predominant Common Questions.*** The Classes' claims present several common questions of law and fact that predominate over questions (if any) that affect individual class members. This includes:

a. Whether mParticle violated Plaintiffs' and the Classes' privacy rights;

b. Whether mParticle engaged in unfair and deceptive conduct;

c. Whether mParticle's acts and practices violate the California Invasion of Privacy Act;

d. Whether Plaintiffs and Class Members are entitled to damages and/or equitable relief, including injunctive relief, restitution, and disgorgement; and

e. Whether mParticle was unjustly enriched.

139. ***Typicality***. Plaintiffs' claims are typical of all Class Members because they arise from the same conduct and are based on the same legal theories.

140. ***Adequate Representation***. Plaintiffs will (and have) fairly and adequately represented the Classes and protected the interest of all Class Members. Plaintiffs have retained competent counsel with significant experience in class action and data privacy litigation. Plaintiffs and counsel have no interest that conflicts with the interests of the Classes and is not subject to any unique defenses. Plaintiffs and their counsel will vigorously prosecute this action to advance the interest of the Classes and have the resources necessary to do so.

141. ***Substantial Benefits***. A class action is superior to all other possible methods to

fairly and efficiently adjudicate this case and controversy, and joinder of all Class Members is impracticable. Proceeding as a class case has significant advantages to individual litigation, including: (1) comprehensive oversight by a single court, which avoids inconsistent outcomes; and (2) saving time and expense by litigating the same claims arising from the same conduct all in one action.

142. Plaintiffs reserve all rights to revise or modify the class allegations based on facts and legal developments following additional investigation or discovery.

**CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS**

143. California law applies to every Class Member's claims. mParticle conducts substantial business in California, including the activities giving rise to Plaintiffs' and Class Members' claims. California has a substantial, overriding interest in regulating the conduct of mParticle under its laws. mParticle's decision to maintain an office in California and avail itself of California's laws makes the application of California law to its conduct alleged herein constitutionally permissible.

144. Under California's choice of law rules, the application of California law is appropriate because California has significant contacts to the claims and Parties in this action, California has a greater interest in applying its laws, given mParticle's presence in the State and the location of the conduct at issue, over any other state.

**CLAIMS FOR RELIEF**
**FIRST CAUSE OF ACTION**
**Violation of Common Law Invasion of Privacy (Intrusion Upon Seclusion)**
**On Behalf of the Plaintiffs and Classes**

145. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

146. Intrusion upon seclusion requires pleading: (1) that the defendant intruded on a

place, conversation, or matter in which Plaintiffs have a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

147. mParticle's collection, interception, and use of Plaintiffs' and Class Members' directly identifiable information, unique identifiers, and private communications constitutes an intentional intrusion.

148. mParticle's interception and use of Plaintiffs' and Class Members' private online communications, associated with their mParticle ID and user profile, is likewise an intentional intrusion upon Plaintiffs' and Class Members' solitude.

149. Plaintiffs and Class Members reasonably expected their personally identifiable information, alongside their online activity, would not be intercepted or used by an unknown third-party. Email addresses and phone numbers are particularly private because they are directly identifiable, permanent identifiers. Plaintiffs and Class Members reasonably expected this information would remain private and confidential and would not be intercepted or used by third parties without their consent.

150. This expectation is particularly heightened given that there were no disclosures of mParticle's involvement in intercepting, processing, and using their personally identifiable information and online communications.

151. Plaintiffs and Class Members did not consent to, authorize, or understand mParticle's interception or use of their private data.

152. mParticle's conduct is highly offensive because it violates established social norms. Consumers do not expect to be surveilled whenever they use the internet, especially in light of state laws requiring companies to make adequate disclosures regarding their collection and use of data.

153. mParticle's conduct is particularly offensive in light of the secretive nature in which it takes place. Plaintiffs and Class Members had no way of knowing mParticle collected their personally identifiable information and other online communications, and mParticle did so from thousands of websites, if not more.

154. mParticle's conduct caused Plaintiffs and Class Members harm and injury, including a violation of their privacy interests.

155. Plaintiffs and Class Members seek damages to compensate harm to their privacy interests, among other damages, as well as disgorgement of profits made by mParticle as a result of its intrusion upon seclusion.

156. Defendant's conduct was willful, knowing, and carried out with a conscious disregard for Plaintiffs' and Class Members' rights. Thus, Plaintiffs and Class Members are entitled to punitive and exemplary damages.

157. Plaintiffs and Class Members also seek any other relief the Court may deem just and proper.

**SECOND CAUSE OF ACTION**
**Violation of Article I, Section 1 of the California Constitution (Invasion of Privacy)**
**On Behalf of the Plaintiffs and Classes**

158. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

159. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." California Constitution, Article I, Section 1. Plaintiffs are both California residents whose privacy rights are protected by the California Constitution.

160. To state a claim for invasion of privacy under the California Constitution, a plaintiff

must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

161. The right to privacy in California's constitution creates a right of action against private and government entities.

162. Plaintiffs and Class Members have and continue to have a reasonable expectation of privacy in their personal information, identities, and private data, pursuant to Article I, Section I of the California Constitution. The manner in which mParticle intercepted this information defeated established privacy-mechanisms and social norms.

163. This conduct constitutes an extremely serious invasion of privacy that would be highly offensive to a reasonable person. Reasonable individuals do not expect that there is an entity intercepting and monitoring all of their online activity, let alone using it to compile online profiles for profit.

164. mParticle's conduct violated the privacy of hundreds of millions of Class Members, including Plaintiffs. mParticle did not have consent to intercept this information, let alone use it.

165. Plaintiffs and Class Members seek damages to compensate the harm to their privacy interests, among other damages, as well as disgorgement of profits made by mParticle as a result of its intrusion upon seclusion.

166. Defendant's conduct was willful, knowing, and carried out with a conscious disregard for Plaintiffs' and Class Members' rights, Plaintiffs and Class members are entitled to punitive and exemplary damages.

167. Plaintiffs and Class Members also seek any other relief the Court may deem just and proper.

**THIRD CAUSE OF ACTION**
**Violation of the California Invasion of Privacy Act ("CIPA")**
**Cal. Penal Code § 631**
**On Behalf of the Plaintiffs and Classes**

168. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

169. CIPA § 631 prohibits any person who uses a "machine, instrument, contrivance" or in "any other manner": (1) intentionally taps or makes an unauthorized connection with "any telegraph or telephone wire, line, cable, or instrument"; (2) willfully and without consent of "all parties to the communication" or in "any unauthorized manner" reads or "attempts to read" or "learns the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within" California; (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way" information so obtained; or (4) from aiding, agreeing, employing, or conspiring with "any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

170. mParticle is a person under CIPA § 631.

171. mParticle designed, created, conspired, and effectuated the interception and use of Plaintiffs' and Class Members' personally identifiable information and private communications in California because (1) Plaintiffs are based in California, where mParticle intercepted their personally identifiable information and private communications; (2) it developed profiles on California citizens, including Plaintiffs; and (3) it partners and cooperates with advertising companies in California—like Google, LLC—to use these user profiles, including those maintained on California citizens.

172. mParticle's technology (e.g., the IDSync system, mParticle ID, mParticle SDK

etc.), and Plaintiffs' and Class Members' computers, mobile devices, and connected TVs, are a "machine, instrument, contrivance, or . . . other manner" under CIPA § 631.

173. At all relevant times, mParticle used its technology to make unauthorized connections with the lines of communication and instruments used by Plaintiffs and Class Members to access online services without the consent of all parties to those communications.

174. mParticle willfully, and without consent, read or attempted to read, or learn the contents and meaning of, Plaintiffs' and Class Members' private communications with online services while those communications were in transmit or passing over a wire, line, or cable, or were being sent or received within California through the IDSync framework and its tracking technology, as described herein. This interception happens prior to or at the same time they would be received by the intended recipient.

175. mParticle used, and attempted to use, these identifiable, private communications for its own benefit, including for data enrichment and to facilitate targeted advertising through its integrations—all for profit.

176. mParticle also aided, agreed with, employed, and conspired with other advertising and identity platforms to intercept and use this data for profit.

177. The interception and use of Plaintiffs' and Class Members' communications was without authorization or consent from Plaintiffs and Class Members.

178. Plaintiffs and Class Members have been harmed as a result of mParticle's conduct. Their private data has been intercepted, viewed, and used for targeted advertising and has not been destroyed. Plaintiffs and Class Members face an imminent threat of continued injury, as this data continues to be stored and used, such that Plaintiffs and Class Members have no adequate remedy at law.

179. Plaintiffs and Class Members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

**FOURTH CAUSE OF ACTION**
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 632**
**On Behalf of the Plaintiffs and Classes**

180. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

181. Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication[.]"

182. Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

183. Plaintiffs' and Class Members' communications to online services are confidential communications for purposes of § 632, because Plaintiffs and Class Members had an objectively reasonable expectation of privacy in this data.

184. Plaintiffs and Class Members expected their communications would not be shared with mParticle, as there were no disclosures that mParticle would secretly eavesdrop upon or record their information and communications.

185. mParticle's IDSync framework and other tracking technology are electronic amplifying or recording devices for purposes of § 632.

186. By contemporaneously intercepting and recording Plaintiffs' and Class Members'

confidential and identifiable communications to online services through this technology, mParticle eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

187. At no time did Plaintiffs or Class Members consent to mParticle's conduct, nor could they reasonably expect that their communications with online services would be overheard and recorded by mParticle.

188. mParticle utilizes these private communications for their own benefit, including to enrich and enhance the data, create comprehensive user profiles, and facilitate targeted advertising through its integration offerings—all for profit.

189. Plaintiffs and Class Members have been harmed as a result of mParticle's conduct. Their private data has been intercepted, viewed, and used, and has not been destroyed. Plaintiffs and Class Members face an imminent threat of continued injury, as this data continues to be stored and used, such that Plaintiffs and Class Members have no adequate remedy at law.

190. Plaintiffs and Class Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

**FIFTH CAUSE OF ACTION**
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 638.50 & 638.51**
**On Behalf of the Plaintiffs and Classes**

191. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

192. CIPA § 638.50(b) defines a "pen register" as a "device or process" that "records or decodes dialing, routing, addressing, or signaling information" that is "transmitted by an

instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

193. Separately, CIPA § 638.50(c) defines a "[t]rap and trace device" as a "device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

194. CIPA § 638.51 prohibits a person from installing either a pen register or trap and trace device without a court order.

195. mParticle is a person under CIPA § 638.51.

196. mParticle implemented and installed the IDSync framework and other tracking technology—which are pen registers and/or trap and trace devices—on Plaintiffs' and Class Members' devices and browsers.

197. These processes captured "routing, addressing, or signaling information" because they intercept: (1) users' directly identifiable information, including email addresses or phone numbers; (2) other unique user identifiers; and (3) information indicating the recipient of the communication.

198. mParticle was not authorized by any court order to use a pen register or trap and trace device to record or capture Plaintiffs' and Class Members' routing, addressing, or signaling information.

199. Plaintiffs and Class Members did not consent to mParticle's installation of a pen register or trap and trace device on their devices and browsers.

200. Plaintiffs and Class Members have been harmed as a result of mParticle's conduct. mParticle did not have authorization to use pen registers and/or trap and trace devices to surveille

and identify Plaintiffs and Class Members or other routing, addressing, and signaling information revealing who the intended recipients of their communications were.

201. Plaintiffs and Class Members face an imminent threat of continued injury, as this data continues to be stored and used, such that Plaintiffs and Class Members have no adequate remedy at law.

202. Plaintiffs and Class Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

**SIXTH CAUSE OF ACTION**
**Violation of the Comprehensive Computer Data Access and Fraud Act**
**Cal. Penal Code § 502 ("CDAFA")**
**On Behalf of the Plaintiffs and Classes**

203. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

204. The California Legislature enacted the CDAFA to "expand the degree of protection afforded . . . from tampering, interference, damage, and unauthorized access to [(including the extraction of data from)] lawfully created computer data and computer systems," finding and declaring that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . forms of unauthorized access to computers, computer systems, and computer data," and that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals . . ." Cal. Penal Code § 502(a).

205. Plaintiffs' and Class Members' devices on which mParticle's tracking technology is installed, including their computers, smart phones, and tablets, constitute "Computer system[s]"

within the meaning of the CDAFA. *Id.* § 502(b)(5).

206. The data that mParticle accessed and collected from Plaintiffs' and Class Members' devices constitute "Data" within the meaning of the CDAFA. *Id.* § 502(b)(8).

207. Defendant mParticle violated § 502(c)(1) of the CDAFA by knowingly accessing and using without permission Plaintiffs' and Class Members' devices in order to wrongfully obtain and use their personal data, in violation of users' reasonable expectations of privacy in their devices and data.

208. Defendant mParticle violated § 502(c)(2) of the CDAFA by knowingly and without permission taking, copying, and making use of Plaintiffs' and the Class Members' personally identifiable information from their devices.

209. Defendant mParticle's tracking technology incorporated on Plaintiffs' and the Class Members' devices constitute "computer services" within the meaning of the CDAFA. Defendant mParticle violated § 502(c)(3) by knowingly and without permission using those computer services, and/or causing them to be used. Defendant mParticle violated § 502(c)(7) by knowingly and without permission accessing those devices, and/or causing them to be accessed.

210. Defendant mParticle violated §§ 502(c)(6) and (c)(13) of the CDAFA by knowingly, and without permission from Plaintiffs and the Class Members, providing and/or assisting in providing advertisers and ads publishers the ability to access Plaintiffs' and the Class Members' personal data via its tracking technology.

211. Under § 502(b)(12) of the CDAFA a "Computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information." Defendants mParticle violated § 502(c)(8) by knowingly and without permission

introducing a computer contaminant via its Tracking Technology incorporated on Plaintiffs' and the Class Members' devices, which intercepted their personal data. As described *supra*, the tracking technology is deeply hidden; Plaintiffs and Class Members had no way to remove it or opt out of its functionality.

212. Plaintiffs and Class Members suffered damage and loss as a result of mParticle's conduct. mParticle's practices have deprived Plaintiffs and the Class Members of control over their valuable property (namely, their sensitive personal data), the ability to receive compensation for that data, and the ability to withhold their data for sale.

213. Plaintiffs and the Class Members seek compensatory damages in accordance with CDAFA § 502(e)(1), in an amount to be proven at trial, and injunctive or other equitable relief.

214. Plaintiffs and Class Members have also suffered irreparable and incalculable harm and injuries from mParticle's violations. The harm will continue unless mParticle is enjoined from further violations of this section. Plaintiffs and Class Members have no adequate remedy at law.

215. Plaintiffs and the Class Members are entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because mParticle's violations were willful and, upon information and belief, mParticle is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294. Plaintiffs and the Class Members are also entitled to recover their reasonable attorneys' fees under § 502(e)(2).

**SEVENTH CAUSE OF ACTION**
**Unjust Enrichment**
**On Behalf of the Plaintiffs and Classes**

216. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

217. mParticle receives benefits from Plaintiffs and Class Members in the form of their personally identifiable information and private online communications. mParticle acquired this

information without Plaintiffs' and Class Members' authorization and without providing corresponding compensation.

218. mParticle acquired and used this private data for its own benefit, including tangible economic benefits from companies that used mParticle for data enrichment, user identification, and to facilitate targeted advertisements.

219. Had Plaintiffs and Class Members known of mParticle's misconduct, they would not have agreed mParticle could acquire and use their private data.

220. mParticle unjustly retained these benefits at the expense of Plaintiffs and Class Members. Plaintiffs and Class Members were harmed by this conduct and were not provided any commensurate compensation.

221. The benefits mParticle received and derived from Plaintiffs' and Class Members' private data, including any revenue generated by its use or sale, rightly belong to Plaintiffs and Class Members. It is inequitable under unjust enrichment principles for mParticle to retain the profits and other intangible benefits they derived through its wrongful conduct.

222. mParticle should be compelled to disgorge these profits and other inequitable proceeds in a common fund for the benefit of Plaintiffs and Class Members.

## EIGHTH CAUSE OF ACTION
**Injunctive Relief**
**On Behalf of the Plaintiffs and Classes**

223. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

224. mParticle's conduct has and continues to cause harm to Plaintiffs' and Class Members' privacy and autonomy, as it continues to maintain comprehensive user profiles, as well as the private contents of their communications, on its own systems. mParticle routinely shares this information with other third parties to facilitate targeted advertising.

225. Accordingly, Plaintiffs and Class Members seek injunctive relief, including an order permanently restraining mParticle from continuing to use and store this information without consent and/or a court order, and requiring mParticle to delete this information from its systems.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and the putative Class request the Court enter an Order:

a. Certifying the Classes and appointing Plaintiffs as Class Representatives;

b. Finding mParticle's conduct unlawful;

c. Awarding injunctive and other equitable relief as is just and proper;

d. Awarding Plaintiffs and the Classes statutory, actual, compensatory, punitive, nominal, and other damages, as well as restitution and/or disgorgement of unjust and unlawful profits;

e. Awarding pre-judgment and post-judgment interest;

f. Awarding reasonable attorneys' fees, costs, and expenses; and

g. Granting any other relief as the Court sees just and proper.

Dated: October 29, 2025

*/s/ Christian Levis*
Christian Levis
Amanda Fiorilla
Rachel Kesten
Yuanchen Lu
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com
rkesten@lowey.com
ylu@lowey.com

Heather Lopez (SBN 354022)

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
280 S. Beverly Drive, Penthouse
Beverly Hills, CA 90212
Telephone: (858) 209-6941
Email: hlopez@milberg.com