UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PETER C. HAYWARD, KELLY GARCIA, and MATTHEW YBARRA, *individually and on behalf of all others similarly situated*,

Plaintiffs,

-v-

MPARTICLE, INC., *and* ROKT US CORP.,

Defendants.

25 Civ. 8173 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This case is brought on behalf of a putative class of consumers whose personally identifiable information ("PII") was allegedly intercepted, harvested, and monetized by defendants mParticle, Inc. and Rokt US Corp. (collectively, "mParticle") in violation of, *inter alia*, California common law tort law, the California Constitution, and the California Invasion of Privacy Act ("CIPA").

Defendants move to dismiss plaintiffs' Second Amended Complaint ("SAC"). Under Federal Rule of Civil Procedure 12(b)(1), they argue that the routine collection of "innocuous contact information" as alleged in the SAC does not plead an injury in fact supporting the named plaintiffs' standing. Under Rule 12(b)(6), they argue that the SAC fails to state a claim. For the reasons that follow, the Court grants defendants' motion under Rule 12(b)(1).

# I. Background

## A. Factual Background

### 1. Parties

mParticle, Inc. is a Delaware corporation that builds and sells user profiles to mobile applications, websites, and other customers. Dkt. 52 ("SAC") ¶¶ 43–48. mParticle, Inc. has a principal place of business in New York, New York. *Id.* ¶ 43.

Rokt US Corp. ("Rokt"), mParticle's parent corporation, is an AI-powered e-commerce marketing platform that specializes in offering targeted advertisements for both the publishers who host its advertisements and the advertisers whose products are advertised. *Id.* ¶¶ 51, 53–54. Rokt is also a Delaware corporation headquartered in New York, New York. *Id.* ¶¶ 50, 57.

At all relevant times, plaintiff Peter Hayward was a resident of Los Angeles County, California, *id.* ¶ 12; plaintiff Kelly Garcia was a resident of American Canyon, California, *id.* ¶ 23; and plaintiff Matthew Ybarra was a resident of Santa Clara County, California, *id.* ¶ 31. Each plaintiff alleges that he or she used online services or applications—such as Venmo, Peacock, and the NBC App—that implemented mParticle's "IDSync" software; that mParticle, unbeknownst to each plaintiff, assigned each a unique "mParticle ID"; and that mParticle intercepted, without plaintiffs' consent, certain information, including their email addresses, names, phone numbers, and device and advertising identifiers, as they logged into and transacted on these services. *See id.* ¶¶ 12–42.

### 2. mParticle's Business Model

In 2017, mParticle, Inc., a company specialized in "build[ing] comprehensive user-specific profiles," launched IDSync. *Id.* ¶¶ 2, 44–47. IDSync offers a persistent, unique, cross-platform identifier to "unify real-time customer interactions" for machine-learning purposes. *Id.*

¶¶ 69–70. mParticle uses this technology and others to profile users, their devices, and their behavior by collecting "every piece of data" about them. *Id.* ¶ 70.

*a. mParticle ID and User Profiles*

The SAC alleges that mParticle builds these user profiles in a three-step process. *Id.* ¶ 71. First, whenever a user opens a website or app that uses mParticle software, an identity request is immediately transmitted to mParticle. *Id.* This identity request consists of an mParticle software development kit ("SDK") or HTTP application programming interface ("API")—two automated technological methods—that intercept a user's request and capture their "email, customer ID[], or device identifier." *Id.* Second, mParticle compares those identifiers against existing records in mParticle's system to search for a matching user profile. *Id.* Third, to the extent a match exists, mParticle transmits that profile to its client; if no match exists, it creates a new profile and assigns it a new mParticle ID to enable future identification. *Id.* ¶¶ 71, 73. Plaintiffs allege that this identification process repeats at the start of a session, at login, and at logout, and that mParticle continues to aggregate newly discovered identifying information—such as an email address entered after a user visits a page—to the existing profile. *Id.* ¶ 72.

The mParticle ID is alleged to be "a 64-bit signed integer" that is used to uniquely identify a user for purposes of processing identity and profile data, and serves as the "anchor" of each user's profile. *Id.* ¶ 74. Using the unique mParticle ID, an mParticle client can retrieve a user's complete profile. *Id.* ¶ 75. An mParticle client can also retrieve a user's complete profile using "any other known identifier like [an] email address, customer ID, or device ID." *Id.* ¶¶ 74–76. Separate from such information, plaintiffs allege that mParticle tracks a "user's IP address and the first and last time it has '[s]een' the user on websites or apps incorporating its SDK." *Id.* ¶ 77.

mParticle integrates additional data to these user profiles from "new inbound data streams." *Id.* ¶ 78 (cleaned up). This data can include a user's age, full name, gender, phone number, address, city, state, zip code, and country, plus event data reflecting specific actions the user has taken and the advertising audiences and campaigns to which the user has been assigned. *Id.* ¶¶ 78–79. To the extent a client retains mParticle's SDK (*i.e.*, it continues to host mParticle's interception technology on its website or app), mParticle continues to collect behavioral data and automatically update the profile to reflect newly obtained identifying information. *Id.* ¶ 80.

Finally, mParticle "enriches" raw user data it receives through its SDK, API, and other means. *Id.* ¶¶ 88–89 (cleaned up). During "data processing," mParticle compares that data batch to the matching "user profile[,] and adds additional information" about the user before transmitting it to "third parties through integrations." *Id.* ¶ 88. For example, before the raw data "enrichment," mParticle may know that a customer using the ID "Bob" purchased a t-shirt for $20 and that his favorite food is pizza. *Id.* ¶¶ 88–90. Comparing this "data batch" to an existing user profile for "Bob"—which includes his email address and favorite drink (beer)—mParticle is able to enrich the user profile for Bob to reflect:

- CustomerID: Bob
- Email: bob@example.com
- User Attributes: Favorite Food: Pizza; Favorite Drink: Beer

*Id.* at 17.

*b. CNAME Cloaking*

A feature of mParticle's software, the SAC alleges, is its ability to circumvent ordinary barriers to tracking, such as a consumer's using private browsing, declining cookies, or enabling Apple's "Do Not Track" feature. *Id.* ¶¶ 81–82. mParticle achieves this mainly by manipulating

the user's Canonical Name ("CNAME") to "prevent blocking and ensure maximum data collection." *Id.* ¶¶ 101–02, 104.

mParticle gives its clients, who operate websites and mobile applications, guidance on how to configure their own respective CNAMEs to defeat device and browser-level protections designed to limit third party tracking. *Id.* ¶¶ 46, 101. Whereas CNAME enables first party website operators to distinguish between services offered by their domain and those offered by third party domains, *id.* ¶¶ 102–03, mParticle's website instructs clients how to configure their CNAME records so that their CNAME reflects that of mParticle (*e.g.* "mp.[domain].com"). *Id.* ¶ 104. Once a client configures their CNAME as such, when a consumer visits an mParticle client's platform, his device will transmit data as if mParticle is "part of the first party domain." *Id.* ¶ 105. This configuration, the SAC alleges, undermines consumers' abilities to protect themselves against entities like mParticle with which they had not knowingly interacted and ensures that "transmissions to mParticle are not blocked by ad blockers or browsers like Safari and Firefox that otherwise prevent third party tracking." *Id.* ¶¶ 103, 105.

*c. Machine Learning and Predictive Attributes*

mParticle also uses the data it intercepts to power machine-learning models. *Id.* ¶¶ 83–86. It analyzes "thousands of behavioral signals" to predict which users are statistically most likely to "convert"—that is, to purchase a product or pay for a service offered by its clients. *Id.* ¶¶ 83–84. It stores these predictive outputs in the user's profile in a field labeled "Predictive Attributes"; these fields are automatically recalculated based on a user's activity. *Id.* ¶¶ 83–86. mParticle builds "predictive audiences," or groups of users whose behavior mParticle's models predict will be similar. *Id.* ¶ 87.

*d. Integration with Third-Party Advertising Platforms*

mParticle shares the user profiles it develops with advertising companies and other "identity providers," such as Google, Meta, and Adobe, to support cross-platform targeting. *Id.* ¶ 92. mParticle forwards user profile data to these companies and identity providers. *Id.* ¶¶ 93–99. The data forwarding enables the recipients to add data to their machine learning systems. *Id.* mParticle also engages in "cookie syncing," in which it and participating clients exchange, in real time, the identifiers they use to recognize a user. *Id.* ¶ 99.

mParticle's integration with Facebook, for example, would enable mParticle user data to be forwarded directly to a Facebook Ads Manager account. *Id.* ¶¶ 94–96. This user data includes email addresses, Facebook IDs, Google Advertising IDs, phone numbers, and behavioral "attributes" and event data. *Id.* This data is relayed directly, and within seconds, to that advertiser, either via a server or the user's browser. *Id.* ¶¶ 92–95. mParticle's clients can combine this forwarded data with tools such as Facebook's advanced matching features. *Id.* ¶ 96. That, in turn, enables Facebook to target the user based on specific attributes guided by Facebook's machine learning advertising models. *Id.*

Similarly, in mParticle's integration process with Google Ads, it forwards its user data to "Google Ads," which "enable[s] Google to identify individuals based on email, phone numbers, or device IDs." *Id.* ¶ 97. mParticle can also "send physical address information" and "transmit[] event data, including 'custom events'" to Google. *Id.* Once it receives a user's profile and data, Google's advertising client can create a "Customer Match list" that empowers "hyper-specific targeted advertising." *Id.*

In sum, mParticle maintains an extensive library containing user data it has integrated from other advertising networks, data brokers, and demand-side platforms, including The Trade

Desk, Adobe, LiveRamp, Xandr, Snapchat, Pinterest, and Yahoo, and it promotes "cookie syncing" arrangements with its partners with whom it consolidates user data. *Id.* ¶¶ 96–99.

### 3. Rokt Acquisition

In January 2025, Rokt acquired a 100% stake in mParticle Inc. for approximately $300 million. *Id.* ¶¶ 57, 120. The SAC alleges that Rokt's acquisition of mParticle was motivated by the value of mParticle Inc.'s real-time feed of user data. *Id.* ¶¶ 118–21. Rokt's CEO and co-founder stated that merging with mParticle enabled it to use mParticle's user data to match and identify individual users and to send targeted advertisements to these users. *Id.* ¶ 121. These "unified customer profiles" enable Rokt to secure "a larger share of enterprise ecommerce budgets." *Id.* The SAC alleges that Rokt and MParticle unjustly benefit by using, in their machine learning algorithms, customer data they have acquired, because Rokt and mParticle are not entitled to such data. *Id.* ¶ 122.

The SAC alleges that the data mParticle obtains and compiles is valuable, as reflected in the scale of the online advertising industry and the fair market sales value of datasets. *Id.* ¶¶ 117–19. In 2023, it notes, the online advertising industry was estimated to be $200 billion. *Id.* ¶ 117. And, a 10-million-record hashed-email dataset was marketed by "datarade.ai" for $5,000 per month, and another dataset offered by "Strista," which combined hashed emails and IP addresses, retailed for $9,500. *Id.* ¶¶ 119–20.

## II. Procedural History

On April 23, 2025, Hayward filed the original complaint in the Northern District of California. Dkt. 1. On June 6, 2026, defendants moved, under 28 U.S.C. § 1404, to transfer venue to this District, or alternatively, to dismiss the complaint. Dkt. 29. On July 3, 2026, Hayward—now joined by Ybarra and Garcia—filed an amended complaint in that district.

Dkt. 32. On August 1, 2026, defendants renewed their motions to transfer or dismiss. Dkt. 39. On September 18, 2025, U.S. District James Donato granted the motion to transfer. Dkt. 46.

On October 15, 2025, in light of the capacity for the transfer to a new District to shape plaintiffs' factual allegations or legal theories, this Court authorized plaintiffs to file a second amended complaint. Dkt. 50. On October 29, 2025, plaintiffs did so. Dkt. 52 ("SAC"). The SAC, the operative complaint today, seeks damages and injunctive relief. *Id.* at 43. On November 12, 2025, the Court, in granting defendants' motion to extend the time in which to answer or move, set a briefing schedule in the event plaintiffs, following a motion to dismiss, sought to file a third amended complaint. Dkt. 58. On December 3, 2026, defendants moved to dismiss the SAC, Dkt. 61, and attached a memorandum of law in support, Dkt. 62 ("Mem."). Plaintiffs elected not to file a new amended complaint but, instead, on January 14, 2026, opposed defendant's motion. Dkt. 63 ("Opp'n"). On February 4, 2026, defendants replied. Dkt. 65 ("Reply").

On July 16, 2026, defendants moved to stay discovery, in light of the pending motion to dismiss. Dkt. 68 at 1. On July 21, 2026, plaintiffs opposed. Dkt. 70. On August 3, 2026, the Court substantially granted the motion to stay, save for limited discovery queries plaintiffs had propounded to clarify the nature and scope of defendants' records and dealings with third parties. Dkt. 71.

## III. Discussion

Defendants move to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, arguing that plaintiffs lack Article III standing. Mem. at 3–7. For the reasons below, the Court grants this motion, finding that the SAC does not plausibly plead, as to any claim, that the named plaintiffs suffered a cognizable injury in fact. The Court accordingly does not reach defendants' alternative grounds to dismiss, under Rule 12(b)(6), for failure to state a claim. *See Ross v. Bank*

*of Am., N.A.*, 524 F.3d 217, 222 n.1 (2d Cir. 2008); *Brown v. Nat'l Football League, Inc.*, 825 F. Supp. 3d 265, 272 (S.D.N.Y. 2026) (Engelmayer, J.).

### A. Applicable Legal Standards

#### 1. Rule 12(b)(1)

A court must dismiss a claim for lack of subject matter jurisdiction under Rule 12(b)(1) when it "lacks the statutory or constitutional power to adjudicate it, such as when . . . the plaintiff lacks constitutional standing to bring the action." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.a.r.l.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (citation omitted). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that [jurisdiction] exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). In resolving a motion to dismiss for lack of subject matter jurisdiction, "the court must take all facts alleged in the complaint as true," *Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006) (citation omitted), but "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it," *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998); *see also Amidax Trading Grp v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam); *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003). On such a motion, a court may consider evidence outside the pleadings, such as affidavits and exhibits. *See Makarova*, 201 F.3d at 113.

#### 2. Article III Standing

Article III of the Constitution limits the federal judicial power to the resolution of "cases" and "controversies." U.S. Const. art. III., § 2. An "essential and unchanging part" of this limitation is that a plaintiff has standing to sue. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff must "demonstrate standing for each claim and form of relief sought."

*Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (quoting *Baur v. Veneman*, 352 F.3d 625, 642 n.15 (2d Cir. 2003)).

The "irreducible constitutional minimum" of standing is that a plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan*, 504 U.S. at 560–61). That requires that a plaintiff's injury be "concrete"—that is, "real, and not abstract." *Id.* at 340 (cleaned up). The injury-in-fact requirement—which figures substantially in this case—is meant to "ensure that the plaintiff has a personal stake in the outcome of the controversy." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) (citation omitted). This requirement "ensures that federal courts decide only 'the rights of individuals' . . . [and] exercise 'their proper function in a limited and separated government.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Marbury v. Madison*, 1 Cranch 137, 170 (1803); John G. Roberts, Jr., *Article III Limits on Statutory Standing*, 42 DUKE L.J. 1219, 1224 (1993)).

Certain harms "readily qualify as concrete." *Id.* at 425. "The most obvious" of these "are traditional tangible harms, such as physical harms and monetary harms." *Id.* at 425. Financial loss is a "classic pocketbook injury sufficient to give [plaintiff] standing." *Tyler v. Hennepin Cnty., Minnesota*, 598 U.S. 631, 636 (2023) (citing *TransUnion*, 594 U.S. at 425); *see also Moreira v. Société Générale, S.A.*, 125 F.4th 371, 385 (2d Cir. 2025) (same). As to intangible harms, the Constitution identifies the contours of such injuries, which bear a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts that are "concrete." *See, e.g.*, *TransUnion*, 594 U.S. at 425. Concrete intangible harms

also include those such as reputational harm, disclosure of private information, and intrusion upon seclusion. *Id.*

### B. Application

In moving to dismiss, defendants contend that the SAC, which alleges that defendants obtained and monetized plaintiffs' "personally identifiable information," does not plead a cognizable injury in fact. Mem. at 3–11. Plaintiffs counter principally that the SAC pleads two privacy-related harms traditionally recognized as adequate to confer standing: invasion of their privacy, referred to at common law as public disclosure of "private facts," and "intrusion upon seclusion." *See* Opp'n at 4–9. They also rely upon the SAC's allegations that defendants harmed plaintiffs' electronic device "resources." *Id.* at 15–16.

#### 1. What Law Governs the Court's Standing Analysis?

The Court must first determine the law governing its Article III standing analysis. Although the parties debate whether California or New York law governs the substantive claims, they are silent as to whether, in assessing standing, the Court must draw upon precedents from the Ninth Circuit, from which this case was transferred, or the Second Circuit, where it currently is being litigated. *See, e.g.*, Mem. at 17 n.5; Opp'n. at 20, 23–24; Reply at 9.

Second Circuit precedent governs the Article III standing analysis here. For a case transferred under 28 U.S.C. § 1404(a), whether the transferee court relies on the law of its Circuit or that of the transferor court turns on whether the issue concerns a matter of state substantive law or federal law. *See Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964). Questions of state substantive law—such as choice-of-law rules—are drawn from the law of the jurisdiction where the action was filed. *See id.*; *Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993) ("[T]he 'accident' of federal diversity jurisdiction does not enable a party to utilize a transfer to achieve a result in federal court which could not have been achieved in the courts of the State where the

action was filed."). But the transferee court applies the law of its circuit when interpreting questions of federal law or the U.S. Constitution. *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.,* No. 00 MDL 1898, 2005 WL 106936, at *2 (S.D.N.Y. Jan. 18, 2005); *see Menowitz*, 991 F.2d at 40–41 ("[A] transferee federal court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit."); *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 91 (2d Cir. 2006), *aff'd sub nom. Warner-Lambert Co., LLC v. Kent*, 552 U.S. 440 (2008) ("[U]nder *Menowitz*, we are obligated to answer independently questions of federal law" using the law of our Circuit).[1]

Whether there is Article III standing is a quintessential question of federal law. *See Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013). Accordingly, the case law as to standing of the Second Circuit controls. *See, e.g.*, *In re Google Digital Advert. Antitrust Litig*., No. 21 Civ. 3446, 2025 WL 3012840, at *3 (S.D.N.Y. Oct. 27, 2025); *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 68, 73 (S.D.N.Y. 2015); *Koehler v. Reefs Beach Club Ltd.*, No. 98 Civ. 4370, 1999 WL 377856, at *2 (S.D.N.Y. June 8, 1999).

### 2. Does the SAC Adequately Plead an "Invasion of Privacy" Injury?

Plaintiffs' principal asserted injury—underpinning each claim—is that defendants' interception, collection, and monetization of information relating to them, which they term their "PII," violated their "privacy" rights. Opp'n at 4–5. The SAC's factual allegations along these lines, however, do not plead a cognizable injury in fact.

#### *a. The SAC's Pleadings as to "Personally Identifiable Information"*

The Court's inquiry focuses on the standing, based on the facts pled, of the three named plaintiffs: Hayward, Garcia, and Ybarra. In a putative class action, the named plaintiffs "must

[1] Both the transferor (Ninth Circuit) and transferee courts (Second Circuit) in this case so hold. *See Menowitz*, 991 F.2d at 40; *Newton v. Thomason*, 22 F.3d 1455, 1460 (9th Cir. 1994).

allege and show that they personally have been injured, not that the injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (citation omitted). Accordingly, for every named defendant, there must be a named plaintiff who can "assert a claim directly against [that] defendant" that he or she was injured in a "personal and individual" way. *NECA–IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 159 (2d Cir. 2012) (citation omitted); *Ross v. AXA Equitable Life Ins. Co.*, 115 F. Supp. 3d 424, 432 (S.D.N.Y. 2015) (same), *aff'd*, 680 F. App'x 41 (2d Cir. 2017) (summary order). Put differently, it insufficient for a plaintiff to allege that an absent member of the putative class experienced a cognizable injury. *Menking ex rel. Menking v. Daines*, 287 F.R.D. 174, 178–79 (S.D.N.Y. 2012).

The personal information that the SAC alleges mParticle obtained from the named plaintiffs falls short of that required to make out an injury in fact.

As to Hayward, the SAC alleges that, without his consent, mParticle intercepted his email address, Venmo name, phone number, mParticle ID, mParticle device ID, "advertising IDs," and a "unique customer ID set by Venmo." SAC ¶¶ 14–18. It alleges that when he made transactions on Venmo, mParticle intercepted: (1) that he was making a payment; (2) the recipient's name; (3) the recipient's username; (4) that the profile type was "personal"; (5) the amount of the transaction; and (6) the "note" a user enters to accompany the payment. *Id.* ¶ 19. He terms this his "personally identifiable information." *Id.* ¶ 22.

As to Garcia, the SAC alleges that she used several online services, including Venmo, that "implemented mParticle's IDSync" technology. *Id.* ¶ 24. The SAC alleges that when she used the Venmo app, her "communications" and "information" were sent to mParticle. *Id.* ¶ 26. With the exception of her "mParticle ID," she does not specify the "communications" and

"information" mParticle obtained; she alleges generally that these "include[ed] her unique identifiers" and "transaction information." *Id.* ¶ 27. She likewise terms the "communications" and "information" that mParticle collected her "personally identifiable information." *Id.* ¶ 30.

As to Ybarra, the SAC alleges that he used online services, including Venmo and the NBC App, that "implemented mParticle's IDSync" technology. *Id.* ¶ 32. From the NBC App, mParticle intercepted his name, email address, mParticle ID, an app user ID, his advertising IDs (such as "IDFV" and/or "AAID"), video title IDs, and video IDs. *Id.* ¶ 35. From the Venmo website, mParticle intercepted his Venmo name, phone number, mParticle device ID, and a "unique customer ID set by Venmo." *Id.* ¶ 38. mParticle thus learned (1) that Ybarra was making a payment; (2) the recipient's name; (3) the recipient's username; (4) that the profile type was "personal"; (5) the amount of the transaction; and (6) the "note" a user enters to accompany the payment. *Id.* ¶ 39. He likewise terms this his "personally identifiable information." *Id.* ¶ 42.

*b. Legal Principles*

A plaintiff claiming injury from the disclosure of her personal information must either demonstrate "actual injuries" resulting from the disclosure or "a substantial risk of harm." *See FritzCo LLC v. Verizon Commc'ns Inc.*, No. 21 Civ. 10432, 2026 WL 734776, at *4 (S.D.N.Y. Mar. 16, 2026) (cleaned up). Because the SAC does not allege actual injuries to any name plaintiffs, the latter standards governs here. Under it, the critical inquiry is "whether the type of data that has been exposed is sensitive such that there is a high risk of identity theft or fraud," *i.e.*, whether the "private information" disclosed constituted "highly sensitive" personal information. *McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 303 (2d Cir. 2021).

Courts in the Second Circuit have held that the disclosure of addresses, telephone numbers, email addresses, device identifiers, and the like are insufficient to support finding a cognizable injury. *See, e.g.*, *Cooper v. Bonobos, Inc.*, No. 21 Civ. 854, 2022 WL 170622, at *6

(S.D.N.Y. 2022) ("*Cooper*"); *Liau v. Weee! Inc.,* No. 23 Civ. 1177, 2024 WL 729259 (PAE), at *5 (S.D.N.Y. Feb. 22, 2024) ("*Liau*"); *Zhizhi Xu v. Reuters News & Media Inc.*, No. 24 Civ. 2466, 2025 WL 488501 (PAE), at *3 (S.D.N.Y. Feb. 13, 2025) ("*Xu*").

In *Cooper*, Judge Furman applied this line of case law to a plaintiff who claimed his data had been intercepted by Bonobos, a chain of men's clothing stores, and disclosed following a data breach. 2022 WL 170622, at *6. The disclosed data included the plaintiff's addresses, telephone numbers, email addresses, order history, Internet Protocol ("IP") addresses, encrypted passwords, and partial credit card numbers. *Id.* at *1–2. Judge Furman held that the plaintiff had not pled an injury in fact supporting his state statutory or common law claims, given the nature of this data and its age. *Id.* at *1, 4. He distinguished between the disclosure of plaintiff's "less sensitive data" (addresses, phone numbers, email addresses, and IP addresses) and his "partial credit card numbers" and "password histories." *Id.* at *3–4. As to the former, he found the risk of harm "entirely speculative, if not fanciful, and thus insufficient to support standing." *Id.* at *4. And as to the latter, he found the disclosure unlikely to cause an injury that was "certainly impending" or suggesting a "substantial risk the harm will occur" in light of the fragmented nature of the data and the age of the information (*e.g.* old passwords) that was captured. *Id.* at *6.

This Court held similarly in *Liau*, finding customers' names, email addresses, and phone numbers not to constitute sensitive information to support standing. 2024 WL 729259, at *8. In that case, a customer of Weee!, an online grocery-delivery service specializing in Chinese and Hispanic ingredients, suffered a data breach resulting in the disclosure of "[his] name, address, email address, phone number, order number, order amount and order comments." *Id.* at *1–2. Relevant here, despite allegations the exposed information included plaintiffs' "order amount"

and "order comments," the Court found such to be "relatively quotidian private information" of the sort that will not support standing. *Id.* at *5; *see also McMorris*, 995 F.3d at 298–301 (finding disclosure of home addresses, dates of birth, telephone numbers, educational degrees, and dates of hire did not support finding injury in fact); *Yankovich v. Applus Techs., Inc.*, 621 F. Supp. 3d 269, 272–74 (D. Conn. 2022) (declining to find standing where plaintiffs alleged dates of births, addresses, and Social Security numbers could have been exposed but did not plead with particularity the "extent to which" they actually had been).

And in *Xu*, this Court found the disclosure of a plaintiff's IP address, collected by unconsented-to trackers, insufficient to support standing. 2025 WL 488501, at *2–6. Xu's complaint did not allege facts supporting that Reuters collected or disclosed any information concerning his "private life"; the Court accordingly, held that Xu had fallen short of pleading that Reuters "collected sensitive or personally identifying information data that could be used to steal [his] identity or inflict similar harm." *Id.* at *3; *see also Gabrielli v. Insider, Inc.*, No. 24 Civ. 1566, 2025 WL 522515, at *3–6 (S.D.N.Y. Feb. 18, 2025) (finding allegation that defendant sent plaintiff's IP address to a third-party does not bear a sufficiently close relationship to the disclosure of private facts so as to support standing); *United States v. Kidd*, 394 F. Supp. 3d 357, 362–68 (S.D.N.Y. 2019) (no reasonable expectation of privacy in IP-related information).

In contrast, in *Cooper v. Slice Techs., Inc.*, No. 17 Civ. 7102, 2018 WL 2727888, at *2–3 (S.D.N.Y. June 6, 2018), Judge Oetken held that, where the defendant sold the content of plaintiffs' emails, the information disclosed was sufficiently sensitive to support standing on federal and state common law claims. *See also Bohnak v. Marsh & McLennan Co., Inc.*, 79 F.4th 276, 281, 283–88 (2d Cir. 2023) (finding disclosure of plaintiff's "Social Security or other federal tax identification number[s] driver's license or other government issued identification,

and passport information" was sufficiently sensitive to support standing); *In re Christie's Data Breach Litig.*, 767 F. Supp. 3d 12, 16–18 (S.D.N.Y. 2025) (finding disclosure of plaintiffs' full names, passport numbers, and driver's license numbers sensitive enough to constitute injury in fact); *In re USAA Data Sec. Litig.*, 621 F. Supp. 3d 454, 465–66 (S.D.N.Y. 2022) (same as to history of military service and driver's license numbers); *In re Unite Here Data Sec. Incident Litig.*, 740 F. Supp. 3d 364, 375 (S.D.N.Y. 2024) (same as to "union members' personally identifiable information and protected health information, including their names, Social Security numbers, dates of birth, and medical information").

Salient here, where a complaint has alleged the unauthorized disclosure of financial-related information, courts have required that this disclosure be linked to some future risk of harm. In *Fero v. Excellus Health Plan, Inc.*, for example, Judge Wolford found the alleged disclosure of "financial payment information (including credit card numbers)" insufficient to support standing where the plaintiffs had not adduced evidence of an "increased risk of identity theft," or any additional monitoring cost. 236 F. Supp. 3d 735, 744–751 (W.D.N.Y. 2017). In contrast, in *FritzCo LLC v. Verizon Commc'ns Inc*, Judge Oetken found that the disclosure of plaintiff's credit card information—which, along with other purloined personal information, enabled third parties to complete unauthorized transactions—supported standing in a case involving state-law claims arising from a widespread data breach. 2026 WL 734776, at *4 (S.D.N.Y. Mar. 16, 2026). Courts in the main have not recognized a freestanding privacy interest in the non-disclosure of financial information. *See, e.g.*, *Whalen*, 153 F. Supp. 3d at 583 (finding against standing based on increased risk of future harm where plaintiff alleged that "fraudulent use of cards might not be apparent for years" and did not allege any out of pocket costs resulting from data breach). And, in an out-of-Circuit case alleging the improper disclosure

of plaintiff's "Venmo password," the District Court of Nevada found such insufficient to support standing where the plaintiff did not allege "an injury-in-fact arising from actual access or misuse of her Venmo." *Prestby v. A&A Servs. LLC*, No. 24 Civ. 204, 2026 WL 26128, at *9 (D. Neb. Jan. 5, 2026).

*c. Application*

Measured against these standards, the SAC's allegations relating to the three named plaintiffs do not plead the disclosure of sensitive information. Although the SAC terms what was disclosed as "PII," its concrete allegations underlying that term fall short.

First, as to each plaintiff, the SAC alleges disclosure of their mParticle ID, mParticle device ID, and "advertising IDs." SAC ¶¶ 14–18, 27, 38. But courts have rejected that such identifiers constitute "personally identifiable information," finding such identifies only "devices, not particular individuals." *Afriyie v. NBCUniversal Media, LLC*, 775 F. Supp. 3d 791, 809 (S.D.N.Y. 2025) ("[W]ithout more information, such as a name or an address, no one can identify the particular individual using a particular device. For all intents and purposes, the device remains anonymous—a nameless and faceless device among a million others."). The same is so for plaintiffs' user profile identifiers, which, as pled, do not reveal the "identity of a particular individual." *Id.*; *see also Wilson v. Triller, Inc.*, 598 F. Supp. 3d 82, 92 (S.D.N.Y. 2022) (finding a user profile identifier not PII where the complaint "contain[ed] no allegation as to what information was actually included on [plaintiff's] profile nor how that information could be used by a third party to identify [plaintiff]"). Such information is akin to an IP address, whose collection, without more, does not give rise to a cognizable injury. *See, e.g.*, *Xu*, 2025 WL 488501, at *2–6.; *Gabrielli Inc.*, 2025 WL 522515, at *3; *Kidd*, 394 F. Supp. 3d at 362; *Smidga v. Spirit Airlines, Inc.*, No. 22 Civ. 1578, 2024 WL 1485853, at *4 (W.D. Pa. Apr. 5, 2024)

("[C]ourts have held that even the collection of basic contact information by [ ] software or where the plaintiffs merely visited the website are not [ ] concrete harms.").

Second, for Hayward and Ybarra, the SAC alleges that mParticle collected their email addresses and phone numbers. *Id.* ¶¶ 14–19, 34–38. Such, however, is the "less sensitive data" that *Cooper*, synthesizing the case law, held insufficient to support standing, 2022 WL 170622, at *3, and that *Liau* found unlikely to be "susceptible to misuse," *Liau*, 2024 WL 729259, at *4–5. It is short of the medical information, Social Security numbers, passport information, driver's license numbers, and the like that courts have held highly sensitive. *See In re Christie's Data Breach Litig.*, 767 F. Supp. 3d at 16–18; *In re USAA Data Sec. Litig.*, 621 F. Supp. 3d 454, 465–66 (S.D.N.Y. 2022); *In re Unite Here Data Sec. Incident Litig.*, 740 F. Supp. 3d 364, 375 (S.D.N.Y. 2024). Courts outside this Circuit have generally rejected claims that the disclosure of email or IP addresses, without more, represents a cognizable injury. *See, e.g.*, *United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008) ("Internet users have no expectation of privacy in . . . the IP addresses of the websites they visit because they should know that this information is provided to and used by Internet service providers for the specific purpose of directing the routing of information."); *Bradshaw v. Lowe's Cos.*, No. 25 Civ. 742, 2025 WL 3171740, at *5 (S.D. Cal. Nov. 12, 2025) (collecting cases and finding that the combination of browser information with other information captured by tracking pixels did not plead a concrete injury to show Article III standing).

Third, as to Hayward and Ybarra, the SAC alleges mParticle collected their Venmo names, unique Venmo IDs, and data relating to their Venmo payments, such as the date, amount, recipient name, profile type (*e.g.*, "personal" or "business"), and "note" accompanying the payment. SAC ¶¶ 19, 39. Plaintiffs cast this information as more sensitive. But the SAC does

not concretely plead a future risk of harm as to this data. It does not allege how this disclosure would enable a future theft from these plaintiffs, in the manner that disclosure of credit card information or bank account passwords could threaten. *See Fero*, 236 F. Supp. 3d at 751. The Venmo data disclosed does not, for example, include any plaintiff's passwords to the platform. *See Prestby*, 2026 WL 26128, at *9. The data allegedly captured by mParticle is akin to the "order amount" and "order comments" held insufficient to support standing in *Liau*. 2024 WL 729259, at *8. Nor does the SAC plead that plaintiffs have incurred or will reasonably incur expenses to mitigate a "substantial risk of future identity theft or fraud," which could support standing. *See Xu*, 2025 WL 488501, at *3.[2]

The SAC, although highlighting mParticle's capability to enrich data and its use of such data in machine learning models, does not develop concretely how these capabilities could injure the named plaintiffs. Nor does the SAC non-conjecturally allege how mParticle's "Predictive Attributes," which appear aimed at identifying fruitful targets for client marketing efforts, *see* SAC ¶¶ 84–85, present a risk of such injury to them. *See Hernandez v. Hernandez*, No. 24 Civ. 8614, 2026 WL 318291, at *6 (E.D.N.Y. Feb. 5, 2026) (citing *Lujan*, 504 U.S. at 560).

The SAC therefore does not adequately plead an injury in fact based on the disclosure of the named plaintiffs' private data to mParticle's clients.

### 3. Does the SAC Adequately Plead an "Intrusion Upon Seclusion"?

The Supreme Court has recognized a harm closely related to, but distinct from, the disclosure of private facts which can support Article III standing: "intrusion upon seclusion."

[2] The SAC likewise alleges the collection of Ybarra's NBC user ID, video title IDs, and video IDs, *id.* ¶ 35, but it does not allege the disclosure of information linking him (as opposed to his device) to any video or video-watching history, *cf. Afriye*, 775 F. Supp. 3d at 809–10.

*TransUnion LLC*, 594 U.S. at 425; *Packer on behalf of 1-800-Flowers.Com, Inc. v. Raging Cap. Mgmt., LLC*, 105 F.4th 46, 51 (2d Cir. 2024).

*a. Relevant Pleadings from the SAC*

In alleging mParticle intruded upon plaintiffs' seclusion, the SAC draws on much the same information as underlies its invasion of privacy claims. *Compare* SAC ¶¶ 147–52, *with id.* ¶¶ 13–39. As to users generally, it alleges that mParticle intruded on "private communications" and intercepted and used "private online communications, associated with their mParticle ID and user profile." *Id.* ¶¶ 147–49.

As to the named plaintiffs, it is sparse as to the communications that may have been intercepted. As to Garcia, it alleges generally that "her communications and information were also sent to mParticle." *Id.* ¶ 27. As to Hayward, it alleges that mParticle intercepted "notes" accompanying his Venmo payments describing the purpose of the payment, that mParticle did so even where "user marked their profile as private, *i.e.* chose that their transactions should no be seen by anyone else other than the recipient," *id.* ¶ 19, and that mParticle transmitted user information to customers "regardless of whether [the user] declined cookies and regardless of whether he used private browsing mode or selected 'Do Not Track' on his mobile device." *Id.* ¶ 21. As to Ybarra, the SAC makes similar allegations. *Id.* ¶¶ 39, 41–42.

*b. Legal Principles*

The Supreme Court and the Second Circuit have not yet defined the showing necessary to plead such cognizable "intrusion upon seclusion." *See, e.g.*, *Bohnak*, 79 F.4th at 284–86 (recognizing "intrusion upon seclusion" and "disclosure of private information" as independent bases for standing in case challenging improper disclosure of PII, but, because former was well pled, not reaching latter); *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 541 n.5 (2d Cir. 2024) (not reaching issue), *cert. denied*, 146 S. Ct. 880 (2025). In a summary order, the Circuit

likewise recognized that the unauthorized "accessing and monitoring of plaintiffs' web-browsing activity implicates harms similar to those associated with the common law tort of intrusion upon seclusion," but it went no further. *Mount v. PulsePoint, Inc.*, 684 F. App'x 32, 34–35 (2d Cir. 2017) (summary order).

Courts in this District to take up the question have drawn upon the formulation of the concept in the *Restatement (Second) of Torts*. *See, e.g.*, *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 786 F. Supp. 3d 647, 679 (S.D.N.Y. 2025) (citing Restatement § 652B); *Xu*, 2025 WL 488501, at *5 (same); *Gabrielli*, 2025 WL 522515, at *6 (same); *see also Melito v. Experian Marketing Sols., Inc.*, 923 F.3d 85, 93 (2d Cir. 2019) (citing § 652B in support of Article III standing analysis). It defines intrusion upon seclusion as follows:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

*Restatement (Second) of Torts* § 652B (A. L. I. 1977). It reaches the intrusion upon a person's private records, but not "the examination of a public record concerning the plaintiff, or of documents that the plaintiff is required to keep and make available for public inspection." *Id.* s§ 652B *cmt.* c.

Accordingly, courts have found a cognizable injury of this nature only where a complaint alleges interference with records "concern[ing] the plaintiffs' most sensitive private affairs." *Am. Fed'n of Gov't Emps., AFL-CIO*, 786 F. Supp. 3d at 679 (finding injury in fact based on intrusion upon seclusion theory where access to plaintiffs' "social security numbers, health care information, banking information, and information about family members" was provided to third parties); *Mills v. Saks.com LLC*, No. 23 Civ. 10638, 2025 WL 34828, at *1 (S.D.N.Y. Jan. 6, 2025) (finding injury in fact not well pled on this theory where complaint alleged that Saks,

without her consent, collected data from its marketing emails); *West v. City of Hartford*, No. 20 Civ. 1210, 2022 WL 17850357, at *8 (D. Conn. Dec. 22, 2022) (finding injury in fact not well pled on this theory where complaint alleged occasional text messages and phone calls to plaintiff, but fell short of pleading that such would be "highly offensive to a reasonable person"), *aff'd*, (2d Cir. May 14, 2024) (summary order); *cf. Sptiz v. Caine & Weiner Company, Inc.*, No. 23 Civ. 7853, 2024 WL 69089, at *5 (E.D.N.Y. Jan. 5, 2024) ("As for intrusion upon seclusion, it 'requires the *intrusion* to have caused an injury, not a subsequent disclosure of the information gained from the intrusion.'" (quoting *Devitt v. Portfolio Recovery Associates, LLC*, No. 21 Civ. 567, 2022 WL 1460278, at *6 n.10 (E.D.N.Y May 9, 2022)) (emphasis in original)).

*c. Application*

Measured against these developing standards, the SAC falls well short of alleging facts to support standing based on "intrusion upon seclusion."

To begin, as reviewed above, the SAC does not plead that the information disclosed about the named plaintiffs implicated their "private affairs or concerns." Restatement (Second) of Torts § 652B. The information allegedly disclosed—email addresses, phone numbers, device identifiers, and user identifiers—is appreciably different from "social security numbers, health care information, banking information, and information about family members." *Am. Fed'n of Gov't Emps., AFL-CIO*, 786 F. Supp. 3d at 679; *Hartley v. Urb. Outfitters, Inc.*, 740 F. Supp. 3d 410, 420–21 (E.D. Pa. 2024) (although the collection by "spy pixels" of "everything under the sun" would constitute an intrusion on seclusion, no such concrete injury was pled; defendant did not collect a "subscriber's complete credit card information, medical history, or social security number"). The closest plaintiffs come are the Venmo notes of plaintiffs Hayward and Ybarra describing the purposes served by particular payments. But the content of these is not pled with specificity, let alone in a manner suggesting these notes, by nature, tended to conveyed private

information, as opposed to quotidian matters such as that particular payments were for shared meals or travel. *See, e.g.*, SAC ¶ 19 (alleging, as to Hayward, only that mParticle intercepted "the 'note' that accompanies the payment describing what the payment is for"); *id.* ¶ 39 (same as to Ybarra); *see Saks*, 2025 WL 34828, at *5 (contrasting defendant's noncognizable collection of information about plaintiff with the use of digital pixels to "trawl through the contents of unrelated personal messages, or to gain access to the camera of a subscriber's device," which would "likely" be held comparable to common-law intrusion upon seclusion (citation omitted)). The SAC does not allege intrusions into personal and intimate details about traditionally private elements of the lives of the named plaintiffs. *Restatement (Second) of Torts* § 652B *cmt.* d (A. L. I. 1977); *see also Campos v. TJX Companies, Inc.*, No. 24 Civ. 11067, 2025 WL 360677, at *4 (D. Mass. Jan. 31, 2025) (not finding intrusion upon seclusion where defendants' pixels, as alleged, did not collect information beyond "the email address, the subject of the email, when the email is opened and read, the recipient's location, how long the recipient spends reading an email, whether it is forwarded, whether it is printed, and what kind of email server the recipient uses"); *cf. Delong v. PHE, Inc.*, No. 24 Civ. 5212, 2025 WL 2447787, at *3–4 (E.D. Pa. Aug. 25, 2025) (not finding intrusion upon seclusion where complaint alleged that defendant disclosed to Google Analytics information about his "sexual interests, activities, and history"; court reasons that plaintiff did not have a reasonable expectation of privacy in his online shopping behavior).[3]

---

[3] To the extent the SAC pursues this theory of injury, it is separately problematic in that it pleads only that mParticle offered instructions to potential clients how to configure CNAME to defeat privacy protections, not that this was mParticle's default configuration, or that mParticle's clients in fact utilized instructions and thereby secured private information of the named plaintiffs. *See* SAC ¶¶ 101–06. These facts fall short of those found well pled in *Mount*, where the defendant actually "deployed code in ads that caused [plaintiff's] Safari browsers to 'drop the default protection and accept tracking cookies.'" *Mount v. PulsePoint, Inc.*, No. 13 Civ. 6592, 2016 WL 5080131, at *4 (S.D.N.Y. Aug. 17, 2016); *accord In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 134 (3d Cir. 2015) (injury in fact pled based on "highly specific

The SAC therefore does not plead a cognizable intrusion upon seclusion.

### 4. Does the SAC Adequately Plead an "Impact" on Plaintiffs' Devices and Systems?

The SAC next claims injury from the impact defendants' actions allegedly had on the named plaintiffs' electronic devices and computer systems. *See* SAC ¶¶ 123–28.

This injury claim is too vague and speculative to support an Article IIII injury-in-fact. The SAC states that "[t]racking technologies similar to mParticle" and "tracking domains like mParticle" have been reported to "result in an additional 15% power consumption for loading websites." *Id.* ¶¶ 125–26. And it alleges that "technologies similar to mParticle's" take up, on average, "an additional 899 KB per webpage in bandwidth," such that, but for "mParticle's secretly embedded technology, Plaintiffs and Class Members would see bandwidth, CPU, data usage, and power consumption savings." *Id.* ¶ 127. But it does not plead facts beyond these generalizations. It does not allege that the named plaintiffs experienced any issues along these lines, whether involving bandwidth capacity, battery health, or otherwise. *See, e.g.*, *Rudolph*, 2019 WL 2023713, at *5 ("mere possibility" of future injury or damage "not enough" to support injury in fact); *Mount*, 2016 WL 5080131 at *9–10 (speculative or *de minimis* marginal effect on electronic device operation does not support finding harm); *In re USAA Data Sec. Litig.*, 621 F. Supp. 3d at 466 (same).

## CONCLUSION

For the above reasons, the Court grants defendants' motion to dismiss under Rule 12(b)(1). Because this dismissal is for lack of subject matter jurisdiction, it is without prejudice to plaintiffs' ability to file a new action with a proper jurisdictional basis. *See Carter v.*

allegations" that defendants took covert actions to circumvent privacy settings on Safari and other browsers in order to deposit third-party cookies).

*HealthPort Techs.*, LLC, 822 F.3d 47, 54–55 (2d Cir. 2016) ("where a complaint is dismissed for lack of Article III standing, the dismissal must be without prejudice, rather than with prejudice").

The Clerk of Court is respectfully directed to terminate the motions pending at docket 61 and to close this case.

SO ORDERED.

Paul A. Engelmayer

PAUL A. ENGELMAYER
United States District Judge

Dated: September 1, 2026
New York, New York